HENRY DREHMAN, Appellant, *v.* CHARLES G. STIFEL, Respondent.

1. *Constitution—Ordinance—Indemnity and Oblivion—Military Power.*—The ordinance of the Convention of March 17, 1865, incorporated in the Constitution, Art. XI., § 34, which forbids the prosecution of all civil actions or criminal proceedings against any one for acts done after January 1, 1861, in pursuance of military orders or in virtue of military authority, does not conflict with the provisions of the Constitution of the United States. Although retrospective in its operations, it is not a bill of attainder, does not violate the obligations of a contract, and does not divest any settled right of property.

2. *Constitution — Action — Forcible Entry and Detainer — Vested Rights.* — A right to recover damages in an action of forcible entry and detainer is not a vested right in property, and is not protected by the Constitution of the United States against the action of a State in its sovereign capacity when acting in Convention, or in virtue of its sovereign powers.

3. *Constitution — State — Sovereignty.* — The people of a State in their sovereign capacity, when founding a civil government, have power to determine

Drehman v. Stifel.

how much of his rights and liberties the citizen shall surrender for the public good, and there is no limitation to this power of the State except the prohibitions of the Constitution of the United States.

4. *Constitution—Retrospective Laws—State.*—The Constitution of the United States does not prohibit a State from enacting retrospective laws or ordinances of a civil nature which take away a right of action, or divest rights invested in an individual, if these laws do not impair the obligation of a contract nor divest settled rights of property. The ordinance of the Convention of March 17, 1865, incorporated in Art. XI., § 31, of the Constitution, is an act of indemnity and oblivion and pardon; of indemnity as far as it affects civil actions, and oblivion as it affects criminal proceedings; and is not inconsistent with the Bill of Rights.

5. *Constitution— Property taken for Public Uses — Military Authority.* — For property taken for public use, or for property destroyed by military authority, the Government and not the officer is responsible.

6. *Constitution— Ordinance— Evidence.*—The provisions of the ordinance of March 17, 1865, and Art. XI., § 31, of the Constitution, have the effect of declaring as a presumption of law and a rule of evidence, that, when the military authority or military orders are shown that the emergency or necessity which justified the acts done shall be presumed as a matter of law. It changes the rules of evidence, and makes that a justification and a defence which would not have been such before without further proof. The military necessity only is thus conclusively proved; but the question whether the military authority or orders existed in fact, or whether the acts complained of were done by military authority or under military orders, or were the acts of the individual himself in his private capacity, or were an abuse of power, or a perversion of orders for private ends or malicious purposes, still remain open for the determination of a jury.

7. *Forcible Entry—Forcible Detainer—Practice.*—If the original forcible entry and detainer be justifiable, a suit for subsequent unlawful detainer cannot be maintained without a previous demand in writing for the possession of the premises and a refusal to deliver possession.

### *Appeal from St. Louis Circuit Court.*

The plaintiff offered testimony tending to prove the forcible entry and detainer by defendant.

The defendant, to prove that he acted by military orders and authority, called C. W. Bissell, who testified that he was assistant adjutant-general to Gen. Lyon, first; that he was then assigned to duty with Gen. Sweeny; the defendant was colonel of the 5th regiment reserved corps Missouri volunteers; he was appointed adjutant soon after the street fight. "I was ordered by Gen. Nathaniel Lyon to examine these

head-quarters with others, with a view of putting them in a state of military defence against attack, which was supposed might be made, and report their condition. I made a report in writing and General Lyon approved it. I then received a positive verbal order from Gen. Lyon; but he told me not to have it then executed, but to request Gen. Sweeny to go with me and examine the premises at both head-quarters. Gen. Sweeny and myself went to the brewery of defendant, and, after a thorough examination, Gen. Sweeny gave a positive order to the defendant, Col. Stifel, to have all those old ruins pulled down and removed, the grounds smoothed, and to put all the ground at and adjoining the brewery under the same fence for parade ground and other military uses. This was after the 8th of May, 1861, and probably as late as June, 1861. Gen. Lyon was then an officer in the United States army, and was in command of the Department of Missouri. Gen. Sweeny was also an officer in the United States army, and was in command of all the forces in St. Louis. I do not know that either Gen. Lyon or Gen. Sweeny had been promoted to the rank of general, but their commands were as I have stated."

Cross-examined.—"I do not know the day Gen. Harney was relieved of the command of this department and Gen. Lyon was assigned to it; I think it was about the 4th of May, 1861. I never saw Gen. Lyon's commission, or Gen. Sweeny's, as generals; but I saw Gen. Sweeny mustered in, and saw his muster-roll as a general, and I was recognized and paid as a colonel on his staff as early as July, 1861, and he was recognized and paid as a general at the same time by a United States paymaster. I know the Government leased the south wing of the brewery of defendant, and the Government had an addition built to it in 1861 for military purposes; the removal of Drehman's house was suggested first by Col. Stifel, and it was at his suggestion that it was acted upon. I consulted fully with him as I did with other regimental commanders as to what was necessary to be done with reference to putting all the posts in a state of military defence.

Plaintiff's instructions :

1. The jury have nothing to do with the title of either party to the ownership of the land. It is a question of possession only in the plaintiff, and of forcibly entry and detainer by the defendant; therefore, if the jury find that the plaintiff was in peaceable possession of the premises in dispute, and that defendant, acting by his agents or servants, entered upon the same against the will of the plaintiff, and took possession thereof and detained the possession, the verdict must be for the plaintiff.

The above instruction was given by the court with this addition : " Unless the defendant has established his defence according to the instructions given at his request."

2. In order to constitute such a possession in the plaintiff as will sustain this action, it is not necessary that the plaintiff should stand on the land, or keep an agent or servant there; but any act done by himself on the premises indicating his intention to hold the possession thereof to himself, will be sufficient to give him the actual possession, and the right to maintain this action.

3. If the jury find for the plaintiff, they will assess damages for waste and injury committed upon the premises, as well as for all rents and profits of said premises up to the present time; and they will also find what is the value of the monthly rents and profits of said premises.

4. If the defendant was a military officer of the State or the United States, he might lawfully take possession of the property of plaintiff to prevent it from falling into the hands of the public enemy; but, in order to justify the seizure for that purpose, the danger must be immediate and impending, and not remote or contingent. He might also have taken them for public use and impressed them into the public service, but in order to justify such taking there must have been an immediate and pressing danger or urgent necessity existing at the time, but not otherwise; and, unless the defendant has shown the necessity or emergency existing at the time of the alleged order and destruction of plaintiff's prop-

erty, it is no defence or justification, and the jury must find for the plaintiff.

5. The 2d section of the ordinance plead in bar of this action is a law retrospective in its action, and in violation of the Constitution of the State of Missouri existing at the time of the passage of said ordinance, and of no validity.

6. Although the jury may believe from the evidence that defendant took possession of the premises of the plaintiff, and destroyed the improvements thereon, in pursuance of an order from one Lyon, or Sweeny, or the witness Bissell, under whom the defendant was acting in a subordinate capacity; yet, unless he shall have shown an authority from the Government of the State, or the United States, vested in said Lyon, or Sweeny, or Bissell, or defendant, at the time the act was done, to do the act, then the ordinance is no protection to the defendant, and the jury must find for the plaintiff.

7. The jury are instructed that the testimony of the witness Bissell, in relation to the orders of Lyon, or Sweeny, to defendant, are excluded from their consideration, and are not evidence in the cause.

8. The 2d section of the ordinance plead in bar of this action is a bill of attainder within the meaning of the Constitution of the United States, and of no validity.

The court gave Nos. 1, 2 and 3, but refused to give Nos. 4, 5, 6, 7 and 8.

The defendant asked the following instructions :

1. If the jury believe and find from the evidence in the cause, that the act of forcible entry and detainer complained of in this action against the defendant was an act by him done, performed and executed after the 1st day of January, 1861, by virtue of military authority vested in him by the Government of the United States to do such acts, or was by him so done, performed and executed in pursuance of an order received by him from a person vested with such authority, then the plaintiff is not entitled to recover in this suit, and your verdict should be for the defendant.

Drehman v. Stifel.

2. The jury are instructed that if Gen. Sweeny, with the approval of Gen. Lyon, issued a military order for tearing away and removing the premises in question, directed to the defendant (if the defendant was at said time in the military service of the United States Government, and subject thereby to the authority of the said generals), then the matter of how said order was procured, or at whose instance, or under what circumstances, cannot be considered by them; for the order, when issued by competent authority, is a justification of the doing of the act by a military subordinate.

3. If the jury believe and find from the evidence that Gen. Lyon was on the 15th June, 1861, in the military command of the city of St. Louis and State of Missouri, and that General Sweeny was in command at the same time of the United States reserve corps, and of which corps the 5th regiment was under the command of Col. Stifel, the defendant; and that on or about that time an order was issued by Gen. Sweeny, with the approval of Gen. Lyon, directed to the defendant, commanding him to tear away and remove the building and building materials upon the premises in question, and enter upon and hold the same for military purposes, and that the defendant, in execution of such order and in obedience to the same, did tear away and remove the said building and building materials, and enter upon the said premises and hold the same, and that the said entry and holding under such circumstances constitute the forcible entry and detainer complained of in this action, then the plaintiff cannot recover herein, and in such case it makes no difference (and the jury are not permitted to inquire into) whether such act was an act of military necessity or otherwise.

4. The jury are instructed that if the entry upon the premises in question was made by the defendant as a military act, done under military authority, and in the doing of which he was and is to be protected under the provisions of the ordinance of the people of the State providing for the vacating of certain civil offices in the State, filling the same anew, and

13—VOL. XLI.

protecting the citizens from injury and harassment, pleaded in the cause, then the subsequent detainer of said premises at any time afterwards by the defendant, if he did so detain them, cannot afford any cause of action against the defendant under the proceedings in this cause.

Which were all given.

The jury found their verdict for the defendant.

The plaintiff, having unsuccessfully moved for a new trial, appealed.

*P. L. & J. P. Hudgens*, and *Doniphan & Field*, for appellant.

I. Appellant insists that the construction given by the court to sec. 4 of art. 11 is incorrect, and in violation of every known rule of statutory or constitutional construction.

It is a well established rule of construction that the whole Constitution, or all of the acts of the same Convention, must be construed so as to be consistent in all their parts; and if sec. 4 of art. 11 is susceptible of two constructions, only one of which is in harmony with the other parts of the Constitution, that construction must be adopted as the true one. This is an admitted rule of statutory construction. So long ago as Rex v. Loxdale, 1 Burr. 147, Ld. Mansfield said, when speaking of acts of Parliament, "that all which relates to the same subject, notwithstanding some of them may be expired or not noticed, must be taken to be one system and construed consistently." So Chancellor Kent, in the first volume of his Commentaries (p. 463–4) said: "It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions.—Sedg. on Stat. & Const. Law. 237–8; Commonw. v. Duane, 6 Binn. 602; Commonw. v. Alger, 7 Cush. (Mass.)

It is also a settled rule of constitutional construction that the bill of rights is the governing and controlling part of a constitution, and all its general provisions are to be ex-

Drehman v. Stifel.

pounded and their operations extended or restrained with reference to it—7 Port. (Ala.) 295.

It was therefore the duty of the court, in construing sec. 4, art. 11, to bring it in harmony with the other parts of the Constitution, and particularly with the Bill of Rights, as the controlling part.

But it is plain that the construction given by the court brings this section in conflict with the 7th, 15th, 16th, 18th, 28th and 32d sections of the Declaration of Rights of the new Constitution. Sec. 15 of the Declaration of Rights declares that "courts of justice ought to be open to every person, and certain remedy afforded for every injury to person, property, or character; and that right and justice ought to be administered without sale, denial, or delay": whereas this subsequent sec. 4 of art. 11 is construed by the court to close the courts of justice to appellant, and deny him any remedy for the injury to his person and property inflicted by the respondent under pretence of military authority.

Sec. 16 declares that "no private property ought to be taken or applied to public use without just compensation." Sec. 18 declares, among other things, that "no person can be deprived of life, liberty, or property, without the judgment of his peers or the law of the land"; whereas the court makes the subsequent section justify the seizure of appellant's private property without the shadow of compensation, and deprives him of liberty and property not only without, but against, the judgment of his peers, twice rendered in the cause. Nay more, it is made to declare that the right of property vested in the appellant in 1854 by contract, and confirmed in 1863 by the judicial determination of the courts and the judgment of his peers, under the law of the land then in force, were divested in 1865 by the legislative enactment or judgment of the Convention, usurping the functions of an appellate court and decreeing a forfeiture of his vested rights.

This construction impairs the obligation of appellant's contracts by retrospective operation, in violation of sec. 26, and

declares that the military is superior to the civil law, and that pretended soldiers may in time of peace be quartered in and even destroy the house of appellant without his consent and without regard to law, in violation of sec. 32, which declares that " the military is, and in all cases and in all times ought to be, in strict subordination to the civil power, and that no soldier can in time of peace be quartered in any house without the consent of the owner." Sec. 10 of art. 1 of the Constitution of the United States declares that " no State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." Sec. 7 of the Declaration of Rights of the Constitution of Missouri declares that " every citizen of this State owes paramount allegiance to the Constitution and Government of the United States, and that no law or ordinance of this State in contravention or subversion thereof can have any binding force"; whereas the court construes the ordinance plead in bar of this action to be in contravention and subversion of sec. 10 of art. 1 of the Constitution of the United States, and yet have binding force. This brings us to the second proposition, viz. :

II. Sec. 4 of art. 11, or the ordinance plead in bar of action, as construed by the court, is a bill of attainder within the meaning of the Constitution of the United States, and of no validity—State v. Cummings, 36 Mo. 271.

" The question then is : Is the provision in the State Constitution referred to (the 3d article) justly obnoxious to these objections ? It does not come within the legal meaning and sense of a bill of attainder ; for, as we have seen above, that is an act inflicting capital punishment. If, then, it is an infraction of the Constitution of the United States in this respect, it must be in the milder form of pains and penalties." " To be a bill of pains and penalties, it is necessary that it should judicially declare a person's estate confiscated, or create a forfeiture of some right, without giving him the opportunity of being heard in the judicial tribunals of the country. It must be a bill or law which by its own force and operation inflicts the wrong complained of."

Drehman v. Stifel.

The Supreme Court of the United States, in reviewing this case, affirms this definition of a bill of attainder; but came to a different conclusion in regard to the 3d article, which it declares to be a bill of attainder within the meaning of the Constitution of the United States, and of no validity. But the conclusion as to the 3d article is not material to the issue involved in this case; all we want is the meaning of bills of attainder, and upon that both are agreed.

Having now ascertained that a bill of attainder, in the milder form, is a law which forfeits some right without giving an opportunity of being heard in the judicial tribunals of the country, let us examine and see if this sec. 4, as construed by the court, forfeits any right of the appellant.

It is admitted that appellant had the right to the property since 1854, by lease extending until 1874; that appellant obtained two judicial determinations of that right in this cause in 1863; that an appeal was taken by the respondent from these judicial determinations to the Circuit Court, and pending the appeal this ordinance, or sec. 4, was adopted by the Convention. Since the adoption of the ordinance, the court says by its instructions that appellant now has no right to the property, or that the respondent is protected by the ordinance in forcibly depriving the appellant of his property, and " the subsequent detainer of the property cannot afford any cause of action under the proceedings in this cause." Respondent has forcibly detained the premises now over six years, yet the court says, under the ordinance, this detainer affords no cause of action to the appellant. Why? Because the ordinance, as construed by the court, deprives appellant of his right to maintain this cause of action which he possessed and enforced before the ordinance was passed. Not only this cause of action, but it deprives the appellant of the right to recover the property at any time in the future, because " the subsequent detainer affords no cause of action" says the court; and if the subsequent detainer affords no cause of action, then appellant can never recover the property, and his right is thereby forfeited. It is then, as con-

strued by the court, clearly a bill of pains and penalties, prohibited by the Constitution of the United States, and of no binding force.

III. The ordinance, as construed by the court, is a law impairing the obligation of contracts, in violation of the Constitution of the United States, and retrospective in its operations, in violation of the Constitution of the State of Missouri, and of no validity.

As we have already seen, appellant's contract was made in 1854; the breach assigned was in 1861. This action was commenced in 1863, and judgment then rendered for appellant, from which respondent appealed; and subsequent to and pending the appeal this ordinance was passed in 1865, and the court now says appellant is deprived of his right of action by the retrospective operation of this ordinance.

In the case of Dash v. Van Kleeck, 7 Johns. 490, the Supreme Court of New York say: "It is not necessary to inquire whether a legislature can, by the plenitude of its power, annul an existing judgment. This power I should undoubtedly deny, because there then immediately arises a contract against the party adjudged to pay a sum of money in favor of him to whom it is awarded." At p. 496 of same case, Justice Thompson says: "Lord Coke lays down the rule to be (Co. Litt. 360, A.), that acts of Parliament are to be so construed as that no man who is innocent, or free from injury or wrong, shall, by a literal interpretation, be punished or endangered." He continues: "Giving to the act now under consideration a retrospective operation would manifestly be productive of these consequences; for it not only takes away a vested right, but punishes and endangers the plaintiff in the payment of costs. If his action is defeated and his right of recovery taken away by this statute, he not only loses his own costs, but will be obliged to pay costs to the defendant"—p. 498. He continues: "In the case of Ogden v. Blackledge, 2 Cranch, 272, in the U. S. Supreme Court, the effect and operation of an explanatory statute was under consideration. In that case as in this (continues Jus-

tice Thompson, and so in the case at bar), the statute was passed after the commencement of the suit. And it was urged by counsel that if the suit had been brought after the passage of the explanatory act, it would not alter the past law and make that to have been law which was not law at the time. To declare what the law is or has been, is a judicial power; to declare what the law shall be, is legislative. One of the fundamental principles of all governments is that the legislative power shall be separate from the judicial; but that, at all events, the statute could not affect that suit which was brought before the law was passed. The court stopped the counsel, considering the question as too plain to be argued." Chief Justice Kent, in delivering his opinion in the same case (p. 500 et seq.), reviews at length the various English and American authorities upon the question of retrospective laws. After endorsing fully the opinion of Justice Thompson, at p. 508, says: "The judges of the Supreme Court of the United States, in the case of Calder v. Bull, 3 Dall. 386, speak in strong terms of disapprobation of such laws; and in Ogden v. Blackledge, 2 Cranch, 272, they considered the points too plain for argument, that a statute could not retrospect so as to take away a vested civil right.

IV. The 4th and 6th instructions asked by appellant, and refused by the court, give the proper construction of the ordinance, and their refusal was error.

Upon the examination of sec. 4 of art. 11 it will be seen that it declares that "no person shall be prosecuted in any civil or criminal proceeding for or on account of any act by him done, &c., by virtue of military authority vested in him by the Government of the United States or that of this State to do such act, or in pursuance of orders from any one vested with such authority."

The first question that naturally presents itself in the construction of this section is, what is meant by "military authority" vested in any one by the United States "to do an act" or command it to be done, and under what circumstances and when does the United States vest such authority

in any person ? By assuming that the phrase "military authority" is used in the sense of rightful or lawful authority, as expressed in appellant's 4th instruction, there is no conflict with any other parts of the Constitution, and all 'is harmonious. The Government of the United States would not vest any person with wrongful authority, therefore it must have meant rightful authority.

These questions have been fully settled by the Supreme Court of the United States in the case of Harmony v. Mitchell, 19 Cond. 427. Mitchell defended upon the ground that he acted under the order of his superior in command ; that the seizure was an urgent necessity for the public good, and to prevent the supplies from falling into the hands of the enemy.

Ch. J. Taney, delivering the opinion of the Supreme Court of the United States, says : "There are occasions in which private property may be lawfully taken or destroyed to prevent it from falling into the hands of the public enemy ; also where a military officer, charged with a particular duty, may impress private property into the public service, or take it for public use. Unquestionably the Government is bound to make full compensation to the owner ; but we are clearly of opinion that in such cases the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and when the action of the civil authority would be too late in providing the means which the occasion calls for." Again he says : "But it is not sufficient to show that he exercised an honest judgment, and took the property to promote the public service ; he must show by proof the nature and character of the emergency, such as he had reasonable grounds to believe it to be, and it is then for a jury to say whether it was so pressing as not to admit of delay, and the occasion such, according to the information upon which he acted, that private right must for the time give way to the common and public good"—Mostyn v. Fabrigas, 1 Cowp. 180.

But in this case the defendant does not stand in the situa-

tion of an officer who merely obeys the command of his superior; for it appears that he advised the order, and volunteered to execute it, when, according to military usage, that duty more properly belonged to an officer of inferior grade.

In the case of Grant v. The United States, tried at the October term, 1863, of the U. S. Court of Claims, Judge Wilmot, in delivering the opinion of the court, after stating that the claim was for private property of Wm. S. Grant, a contractor of the Government, destroyed and abandoned in Arizona, on the 15th of July, 1861, by order of Captain Moore, commanding U. S. troops in the vicinity of Tucson, says: "We must come to consider the necessity under which this property was destroyed. It is necessity alone that gives the right to take private property for use or destruction. The danger must be threatening, such as demands immediate action, and when delay would work public injury. Unless the necessity is such as to justify the officer, he is a trespasser, and there is no liability on the part of the Government. * * If however the danger, as he ought to have seen, was remote, the necessity not pressing, courts will hold him personally responsible to the party aggrieved."

The 4th instruction asked by appellant declares the law under which private property may be taken, as expounded in the foregoing cases by the highest tribunals of the Government, and appellant insists is the only admissible construction of the ordinance plead in bar. Apply this rule of construction: did the respondent do the act by virtue of military authority vested in him by the United States, or in pursuance of an order from one vested with such authority? To be vested with or have such authority, there must have been urgent, immediate and impending necessity, such as would not admit of delay. Unless such existed, the officer had no authority to do the act, or command it to be done, and was a trespasser and personally liable as such. If the necessity existed sufficiently to justify the officer, his authority to do the act was rightful and the liability of the Government established; and the provision in the Bill of

Rights, providing that private property shall not be taken without compensation, is saved, because the Government is bound to make compensation for property rightfully taken by its authority. The principle that an illegal order of a superior to an inferior officer is no justification to such inferior or subordinate officer, has long been recognized in cases of civil officers—10 Pet. 81; Sedg. Dam. 486.

The respondent claims to have been in June, 1861, the colonel of an organization called "Home Guards." This organization was without warrant or authority of law. There was not then, nor is there now, any law of the United States or of this State authorizing any such organization. It was assumed voluntarily upon the part of the respondent, and, being without authority of law, the respondent could not in any sense have military authority to do the act complained of, when he had no rightful authority whatsoever to do any military act on behalf of the State or United States. He voluntarily assumes to be colonel, then assumes the right to tear down his neighbor's house, and destroy the premises, under the pretext that the Government of the United States wanted this 30 by 140 feet of ground to drill his undisciplined, self-constituted organization. The Government did not know of any such organization at the time, and has never recognized it since.

V. The court erred in refusing the proofs of respondent's acts prior to 15th June, 1861—these acts were competent to show that the act complained of was not the act of, or authorized by, the State or United States—and in refusing the 6th instruction, which was intended to preserve the exceptions more specifically.

The ordinance had been plead in bar, and appellant offered testimony of respondent's threats to "fix appellant," Drehman, if he did not surrender the premises, and tending to show Stifel's efforts to get possession of the premises before he assumed to be colonel or was connected with this assumed military organization. The testimony clearly showed that it was an act of Stifel for his own individual benefit, contem-

plated long before the military pretext was conceived, and in no sense an act authorized by the Government. It was also competent to show the motives and circumstances that surrounded the respondent at the time of the act. But the only evidence on record in regard to any military order is that of the witness Bissell, who testifies that Col. Stifel requested or suggested to him to get Gen. Sweeny to issue this order; and he testifies that it was merely a verbal order, given on the suggestion of the respondent, and amounts to nothing more than a verbal permit from one without authority to commit a trespass.

It is claimed by the respondent in this case, and the court sustains the assumption, that an assumed or real military officer has the power in this civilized country to dispense permits or indulgences to his subordinates to appropriate to themselves or destroy their neighbor's property at pleasure, without any responsibility to anybody—permits to trample on the Constitution and sacred rights of the citizen—permits to destroy the foundations of the Government they claim to support, and establish on its ruins a military despotism in which every assumed military gentleman is an absolute tyrant. Such is not the law, nor is it a proper construction of the ordinance or section of the Constitution plead in bar of this action. It must have been intended to declare the common law rule as given by Ch. J. Taney and Judge Wilmot in the case above referred to. Any other construction does violence to the intelligence of the Convention that formed the Constitution, and establishes in the future a military despotism instead of a constitutional republican form of government, which, in the opinion of Ch. Justice Taney, delivered in 7 How. (U. S.) 45, "it would be the duty of Congress to overthrow," under its constitutional power and duty to guarantee to each State a republican form of government.

*Jecko & Clover*, for respondent.

HOLMES, Judge, delivered the opinion of the court.

This was an action of forcible entry and detainer upon a complaint made before a justice of the peace under the statute. The case comes here by appeal from the St. Louis Circuit Court. The proceedings were commenced in September, 1863. After several trials before the justice, and a recovery, at last, of some $7,000 damages, an appeal was taken to the Circuit Court, where it was tried again in May, 1866, after the passage of the ordinance of 1865, relating to such suits, which had been pleaded in bar, and a verdict and judgment were rendered for the defendant. The questions for consideration here arise mainly upon the instructions which were given or refused by the court below.

Divested of all extraneous irrelevant matters, the substance of the case made on the facts may be stated as follows:

Sometime in the first half of June, 1861, during the first uprising of rebellion in Missouri, and in a time of civil commotion, great peril and actual war, while General Lyon had command at the Arsenal and post of St. Louis, a regiment of Home Guards under Col. Stifel (the defendant here), by order of the commanding officer of the post, occupied a certain brewery building in the tenth ward of the city as their camp and head-quarters, and as a position for the defence of the city and the protection of the community against insurrectionary violence. This brewery belonged to the defendant. A two-story building on the adjoining lot, belonging to the plaintiff, had twice taken fire and was partly burned, and, being rendered untenable, was vacated by the plaintiff, who left the premises under the charge of an agent residing in the neighborhood. Nobody was in the actual occupation of the premises. Upon a suggestion made by the defendant, as colonel in command, to the commanding officer at the Arsenal, his adjutant was sent to examine the premises, with a view of putting the position in a state of military defence

(as the adjutant himself states) and to report their condition. Upon the report of this officer a positive verbal order was given to him by the general in command, to examine the place again in company with the general officer commanding that immediate district, and, with his approval, to have these burnt ruins pulled down and removed, and to have all the grounds adjoining the building smoothed off for a parade ground and other military uses. After consulting fully with the general and other regimental commanders as to what was necessary to be done (as he says) with reference to putting all the posts in a state of military defence, the order was given to the defendant, under which, as expressly directed, he seized the premises for the public use, and proceeded to remove the ruins and clear the ground. The premises were occupied by this regiment for some time, but were evacuated by the military forces before the first day of January, 1862, and were not, after that date, claimed or occupied by the defendant, though the enclosure erected by the military authorities still remained there.

The plaintiff offered some evidence tending to show that the defendant owned the brewery, and had some time previously purchased the reversion of the plaintiff's lease of this lot, had refused to accept rent from the plaintiff, and had desired to purchase his lease. This evidence was properly excluded as irrelevant and immaterial. It had no direct bearing upon the issue, and could only tend to mislead the jury. Some slight circumstances having a like tendency were stated by some of the witnesses for the plaintiff, upon which his counsel have endeavored to construct a theory respecting the conduct and motives of the defendant, which, so far as we are able to discover from anything contained in the record, would seem to be in great part imaginary or wholly unfounded, and not at all warranted by the evidence produced, to the effect that the military order was procured by the defendant for a malicious or selfish purpose, and was a mere cover for his own private ends, and that the acts done were not done by virtue of any lawful military authority, nor

upon any immediate and pressing danger, or upon any urgent necessity for taking private property for public use, but were an arbitrary abuse of military power, and, in fact, a lawless invasion of private property for individual purposes, without any military authority whatever. The plaintiff appears to have proceeded on the assumption that the Home Guards were an unauthorized military force, and that the acts of these officers were to be regarded as trespasses and forcible entries, and that the personal relations and individual transactions of these parties were admissible in evidence on the issues in the case. It is not apparent how the justification of a military officer for acting in obedience to positive orders can in any manner depend upon his private relations with the parties whose property happens to be taken for public use. We deem it unnecessary to dwell upon this part of the case. It is not otherwise important than in reference to the instructions. We are not well satisfied that there was any competent evidence before the jury which could have warranted them in finding the fact according to the theory supposed, but the instructions will be considered on the supposition that there was some evidence tending that way.

The principal instruction refused for the plaintiff proceeds upon the law, as it was laid down in Harmony v. Mitchell, 13 How. (U. S.) 115, that the existence of some pressing danger or urgent military necessity was a question of fact for the jury to determine.

The defendant's instructions, which were given, appear to have been framed with reference to the ordinance passed in Convention on the 17th of March, 1865, and subsequently incorporated into the Constitution of the State—Const. art. 11, § 34. It reads as follows:

"No person shall be prosecuted in any civil action or criminal proceeding, for, or on account of any act by him done, performed, or executed, after the first day of January, one thousand eight hundred and sixty-one, by virtue of military authority vested in him by the Government of the Uni-

ted States, or that of this State, to do such act, or in pursuance of orders received by him from any person vested with such authority; and if any action or proceeding shall have heretofore been, or shall be hereafter instituted against any person for the doing of any such act, the defendant may plead this section in bar thereof."

The purport of these instructions was, that nothing was to be left to the jury to find, but the fact, whether or not the acts of forcible entry and detainer complained of were done after the first day of January, 1861, and by virtue of military authority vested in the defendant, or in pursuance of an order received by him from a person vested with such authority under the Government of the United States; that it was immaterial, in such case, at whose instance or under what circumstances of military necessity the order was issued, and that if the acts were done by virtue of such military authority, or in obedience to such orders, it made no difference whether or not an urgent or pressing military necessity were otherwise proved; in short, that the existence of a military necessity in such cases was not a matter of fact for the jury to determine, but a matter of law for the court under this ordinance, and upon the evidence adduced.

So far as this ordinance affects the plaintiff's case, it may be conceded that it operates to make such military orders and authority a complete justification for the acts done by the defendant in pursuance thereof, and to take away from the jury all consideration of the question whether there existed, in fact, any immediate and pressing military necessity for the issuing of such orders, and that it so far deprives the plaintiff of any right to recover damages from the defendant for acts done by virtue of such *military authority, or in obedience to such orders; but the questions whether such military authority or orders existed, in fact, or whether the acts complained of were actually done by virtue of such authority or orders, or whether they were done maliciously or for private and selfish ends, using the authority or orders as a mere pretence or cover, or were an arbitrary abuse or a wil-

ful misuse of power for other purposes than those contemplated by such authority or orders, may still be a matter of fact for a jury to determine, under the ordinance.

So far as the ordinance operates retroactively upon the plaintiff's case, it may be said to deprive him of his right to recover, but it does not take away nor infringe any vested right of property. A right to recover damages in an action of forcible entry and detainer is not a vested right of property.

The Federal Constitution does not prohibit a State from passing retrospective ordinances of a civil nature, which merely take away a right of action or only divest rights vested by law in an individual, if it does not impair the obligation of a contract, nor divest settled rights of property. The ordinance is not, therefore, in this respect unconstitutional—Calder v. Bull, 3 Dall. 386; 2 Sto. Const. § 1398; Smith's Com. Const. Law, §§ 266, 267, 378. That it is a bill of attainder, as contended, there cannot be any rational pretence. There is nothing in it that relates to proceedings of a criminal nature in the sense of a bill of attainder, nor does it confiscate private property, nor punish anybody. It is rather an act of indemnity, oblivion, and pardon; of *indemnity*, in so far as it makes military orders and authority a justification for acts done by virtue thereof; of *oblivion* and *pardon*, in so far as it prohibits criminal prosecutions for acts done by such authority. It is not necessarily inconsistent with anything contained in the bill of rights in the same Constitution. The Legislature, only, is prohibited from passing retrospective laws (Art. 1, Const., § 28); this is an ordinance of the people in their sovereign capacity, founding a civil government. They had the power to define how much of the rights and liberty of the citizen he should be required to surrender for the public good, and there was no other limit of positive law upon this power but the prohibitions of the Federal Constitution, which do not reach this case. If this ordinance be deemed an unwise abridgement of the rights and liberties of the citizen, or whenever it shall be thought to operate op-

pressively or unjustly, the remedy lies with the people in the power of amendment. We have only to declare the law as we find it.

There is no evidence of any actual appropriation of the plaintiff's property beyond the military occupation of the premises and the waste committed in clearing the ground for the use of camps and quarters. When the military occupation ceased there was nothing to prevent the plaintiff from retaking possession; or, if any private individual retained the possession, he had his action of unlawful detainer, on demand made in writing under the statute, or his action of ejectment to recover the possession. His right of property in the lease was not taken away. The military possession for the public use was merely temporary. For this use of his lot, as well as for the value of the property destroyed, he was entitled to look to the Government for compensation. He seems to have preferred to consider the whole proceeding as an individual trespass, a forcible entry and detainer by a private person, and an unlawful appropriation of the property in his individual capacity and for his own purposes, and wholly to ignore the military authorities. It is not a little remarkable that he should neglect to make an effort to regain the possession when the military forces evacuated the premises, but should resort to this form of action against the defendant nearly two years after that event. He is now seeking to recover, by way of damage, double the amount to be assessed as damages for the forcible entry and detainer, for the value of the property wasted, and for all rents and profits up to the finding of a verdict, under a statute which was made for the protection of the citizen against forcible invasion of private property by an individual, acting altogether without any authority of law.

Now, it would seem to be reasonable that, in order to make this statute applicable to a military officer acting under express orders from the highest military authorities, in time of civil war, and under circumstances of great public peril, in

14—VOL. XLI.

the midst of a treasonable insurrection, when speedy action and the utmost energy were required, the clearest proofs of the want of lawful authority, of an arbitrary abuse of power, and a plain perversion of military orders to malicious purposes, or selfish private ends, ought to be demanded. Even if this were a case in which the existence of pressing danger or urgent necessity were to be submitted to a jury as a matter of fact, where the officer produces unequivocal evidence of both military authority and express orders for what was done in justification of his acts, something like direct and positive evidence to the contrary ought to be expected. It may be that the plaintiff was not aware of any urgent necessity. A sagacious military commander is apt to see necessities that are not apparent to everybody. It is probable that there were a great many who saw no military necessity for the capture of camp Jackson, but a short time before this transaction, until long after it was taken. The mere fact that personal relations of no very friendly character existed between these parties, or that the defendant was personally interested in this property, while it may tend to explain the course taken by the plaintiff, furnishes no satisfactory evidence of an abuse of power for private ends; nor was there any evidence tending to show that no such military exigencies existed, or that these premises were not needed for the public use. On the other hand, there was direct and positive evidence that two military officers, besides the defendant, on personal inspection of the position, made report of the military necessity of what was ordered to be done. Not only the existence of the military orders, but the existence of the military necessity which justified them, was distinctly proved.

There is a wide difference between this case and those which have been cited on behalf of the plaintiff. Where a naval commander under the orders of the admiral had pulled down the houses of some sutlers, who sold liquors to the sailors, on the coast of Nova Scotia, he was held liable to an

action for damages, because there was not the slightest pretence of any military necessity, nor was the act within the scope of military authority—1 Cowp. 180.

In Mitchell v. Harmony, 13 How. (U. S.) 115, there was no pressing danger from the enemy, nor any occasion whatever for taking the private property for public use, but it seems to have been seized because it was thought it might contribute to insure the success of a distant expedition on which the officer was about to march. The jury had found the fact to be so, and the court held this was a question of fact for the jury to determine. The orders were proved, but the evidence showed that neither the orders nor the act were justified under military authority in that state of the case.

This verdict might stand upon the law as laid down in that case, if it had been found under instructions to the same effect. It recognized the law to be, that a military officer, charged with a particular duty, might impress private property into the public service, or take it for the public use, and that the Government would be bound to make compensation; but that the officer should not be regarded as a trespasser when an urgent necessity was shown to exist, and that he would be justified in acting upon the information of others, as well as his own observation, affording a reasonable ground of belief that the peril was immediate or the necessity urgent, though it should turn out to have been erroneous or unfounded, and that he would not be a trespasser; but it was also held to be a matter of fact for the jury to determine, whether such emergency existed or not.

Now, the only effect that need be given to the ordinance, in order to make it cover this case, and justify the instructions which were given for the defendant, is this : that when the military authority and orders are made to appear, the existence of the emergency or military necessity shall be deemed to be conclusively proved and established by the judgment of the officer, and shall be presumed as a matter of law. It operates so far to change the rules of evidence. It makes that a justification and a defence which would not

have been such before without further proof. In this, it is not unlike those statutes which make certain facts proven to have the effect to raise a conclusive presumption of negligence or liability. The military necessity only is thus conclusively presumed, but the questions whether the military authority or orders existed in fact, or whether the acts complained of were really done by virtue of such authority, or were the acts of the individual in his private capacity, or were an abuse of power or a perversion of orders for private ends or malicious purposes, would be still open for determination by the jury. The evidence thus far makes a change in the law as it stood before, but we do not think it is for this reason unconstitutional.

The first three instructions which were given for the defendant, left to the jury to say whether these officers had military authority under the United States, and whether the acts of the defendant in the premises were done in pursuance of orders issued by such authority. They took away from the jury the consideration of the military necessity and nothing more. We think the instructions were correct, and that the verdict was fully justified by the evidence.

The fourth instruction for the defendant proceeded upon the ground that a detention of the premises by the defendant, as a private individual, after the military evacuation, would be an unlawful detainer only, and would not sustain an action for a forcible entry and detainer. In such case a demand in writing for the possession and a refusal would be necessary to give a cause of action under the statute. Such detainer would only amount to a disseizin—27 Mo. 377; R. C. 1855, p. 787, § 3. We see no material objection to the instruction.

The fourth and fifth instructions, which were refused for the plaintiff, are sufficiently disposed of by what has been said above.

The sixth instruction was rightly enough refused, for the reason that the military authority was amply proved, and there was no evidence to the contrary, and though it might

Drehman v. Stifel.

have been given, its refusal could do no prejudice to the rights of the plaintiff. The same question of fact was submitted to the jury in the instructions which were given. There was no error in this of which the plaintiff can complain.

As to the plaintiff's seventh instruction, it may be observed that no objection was taken in the course of the trial to the admissibility of the evidence that was produced by the defendant to prove the military authority and the orders, and being once admitted without objection, even if any valid objection could have been taken, the court very properly refused to exclude it from the jury by an instruction at the close of the case.

The eighth instruction refused needs no further consideration. There was no possible ground on which the ordinance could be called a bill of attainder.

There being no error that can entitle the plaintiff to a reversal, the judgment will be affirmed. The other judges concur.