SNEED, J.,
delivered the opinion of the Court.
This case involves the grave question, whether a -white person and a negro may lawfully intermarry, or cohabit, as man and wife, in this State. The prisoner is a negro, and was indicted, tried and convicted, of the offense of cohabiting, as man and wife, with one Kebecca Teaster, a white woman, on and before the 10th of January, 1871, in the county of Knox. He was adjudged to suffer confinement in the Penitentiary for two years and six months, and to reverse said judgment, he has appealed in error.
The Act of 1870, c. 39, forbids the intermarriage of white persons with negroes, mulattoes, or persons of mixed blood, descended from a negro to the third generation inclusive, and their living together as man and wife in this State. The statute is in the identical words of the Constitution of 1870, art. 11, s. 14, the last clause of which imposes upon the Legislature the duty of enforcing the provision by appropriate legislation. The second section in the statute is in the words following: “The persons knowingly violating the provisions of the first *301 section of this act, shall be deemed guilty of a felony, and upon conviction thereof, shall undergo imprisonment in the penitentiary not less than one, nor more than five years; and the court may, in the event of a conviction, on the recommendation of the jury, substitute in lieu of punishment in the penitentiary, fine and imprisonment in the county jail:” Shank. Sup., 102.
It is contended by the counsel for the prisoner, in an argument of much force and ability, that the statute of the State for the regulation of its internal polity upon the subject of marriage, and the provision of our organic law upon which it is founded, are repugnant to the constitution and laws of the United States, and, therefore, null and void. It is certainly true that the supreme law of the land, in this country, is the Constitution of the United States, and the laws made in pursuance thereof, and the treaties made or which shall be made, under the authority of the United States, and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding: Con. U. S., Art. VI, s. 2. And “whether the State law is organic, in its constitution or any ordinance, or whether, it be a statute, if it violate the constitution, laws, or a treaty of the United States, it is simply void, and the courts of every State are bound by the supreme law, and not by the State law:” Marbury v. Madison, 1 Cr., 137; Calder v. Bull, 3 Dall., 386; Satterlie v. Mattison, 2 Peters, 380; Ex parte Garland, 4 Wall., 399; Paseh. Anno. Cons., 250. But it is the glory and the boast of our written constitution, that the powers of the law-makers are restricted and defined; and while it is the legitimate *302 and lawful province of the Supreme Judicial Tribunal of the Union to determine the validity of a statute assumed to have been enacted under the authority of the organic law, it is no less the prerogative of the State tribunal to interpret its own State laws, and to pronounce upon their compatibility with the supreme organic law. And to this end, they may look beyond a statute of the general government which seems to collide with the law and polity of the State, to ascertain whether such statute is made in pursuance of an authority vested by the supreme organic law. For it is not every Act of Congress that the “judges in every State” shall be bound by, but only such as are passed in pursuance of the authority granted by the Constitution. And this power of a State Court to pronounce upon the validity of an Act of Congress which is made to operate upon the people, subject to the jurisdiction of said court, has been exercised from the foundation of the government, of which we have a notable illustration in the action of half a dozen State courts within the last few years, in declaring the Stamp Acts of Congress, so far as they changed or interfered with the rules of evidence in the State courts, to be unconstitutional and void. Until the Supreme appellate tribunal of the Union shall declare otherwise, that question is at rest in the States whose courts have so decided. The government of the United States being one of limited powers, is, therefore, supreme only to the extent of the granted powers; and all laws upon the rights, duties and subjects specially enumerated and confided to its jurisdiction, are necessarily exclusive and supreme: Sims’ Case, 7 Cush., 729. If, therefore, a law be enacted not authorized *303 by the enumerated or clearly implied powers, it is not in the sense of the constitution the supreme law of the land, and the courts of the States are not bound to carry it into execution. But the Supreme Court of the United States is the tribunal of last resort on all such questions, whose judgment is conclusive and final upon the question, whether an Act of Congress be or be not the supreme law of the land: Ableman v. Booth, 21 How., 519. When it it is so .declared, it is as much the duty of the State courts to accept and enforce it, as it is their province and duty, in the first instance, to question its validity, and decline to enforce it, when in their judgment it has been enacted without authority.
“Among .the powers,” said Judge Curtis before the late amendments, “unquestionably possessed by the States, was that of determining what persons should and what persons should not be citizens; and each State must deter- . mine,” said he, “what civil rights shall be enjoyed by its citizens, and whether all shall enjoy the same, or how they may be gained or lost:” Scott v. Sandford, 19 How., 583.
In the evil days to which we have brought ourselves by our late unhappy feuds, we are too apt to forget the moorings of the law, where our fathers left us. While it is our first duty to respect and obey every valid law that emanates from the law-making power of the Federal Government, yet we are too prone to magnify the civic powers of a government which has so lately crushed a dozen great States by an exhibition of military power that might have defied the world, and, lawyer and lawgiver, court and commonwealth, to bow without question to the civic will of the victor.
*304 The Goths of ancient Germany, it is said, were accustomed to debate every important measure twice in their councils; once while drunk, that their debates might not lack.vigor, and again, while sober, that they might not lack discretion. Now, that we have returned to the blessed paths of soberness and peace, when human rights and human wrongs are to be vindicated and redressed by the laws of the land and not by the logic of the bullet and the bayonet, it is well to look .back upon our landmarks which our fathers have set, and ascertain what rights the States have not been bereft of as the result of the late unhappy civil war. And prominent and paramount among these, is the provision that “the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, and to the people: Art. 10, Con. U. S.
The powers delegated to the United States, and those prohibited by it to the States, are ascertained and defined by the terms of the Constitution itself. “Those which are to remain in the State governments,” said Mr. Madison, “are numerous and indefinite. The power reserved to the several States will extend to all objects which, in the ordinary course of affairs, concern the lives, liberty and properties of the people, and the internal order, improvement and prosperity of the State:” Federalist, No. 45. Perhaps, we will be unable to find embodied in a few words so correct an idea of the general powers reserved to the States, as in this brief observation of one who was, without disparagement to his renowned compeers, the best authority, living or dead, upon the sense and meaning of our fundamental law. The Congress of the United States has never, from the foundation of the *305 government, interfered with the internal polity of the State, in regard to marriage or the other domestic relations, and we apprehend it never will. Those things have been left where the Constitution left them, and where Mr. Madison left them, to the States which control all matters “that concern the lives, liberties and properties of the people, and the internal order, improvement and prosperity of the State.”
But it is said that old things have passed away, and all things have become new; and that the late amendments which give freedom to the slave, and confer upon him the right of suffrage, and guarantee to him the equal protection of the law, vouchsafe to him, also, the right of intermarriage with the white race. The fourteenth amendment to the Constitution of the United States, or so much of it as is important to be considered here, is in the following words: “All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.”
What is called the Enforcement Act, which was passed to give effect to the provisions of the fourteenth amendment, as applicable to the question before us, is as follows: “All persons within the jurisdiction of the United States, shall have the same right in every State and Territory of the United States, to make and enforce contracts, to *306 sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions, of every kind, and none other; any law, statute, ordinance, regulation or custom, to the contrary notwithstanding.”
The Civil Nights Bill, passed to give effect to the thirteenth amendment, which gave freedom to the slaves, is substantially and almost literally the same as the foregoing. The Enforcement Bill became a law on the 31st day of May, 1870, and the Civil Nights Bill several years before.
If the African, in this country, has been elevated to a perfect equality in social, as well as political, rights with the Caucasian; if that race can claim at all the right to marry and be given in marriage with the sons and daughters of our people, it must be claimed alone by virtue of the foregoing amendments and the laws enacted for their enforcement. The State, then, is forbidden from making and enforcing ■ any law which shall abridge the privileges and immunities of citizens of the United States. It is said that “the words rights, privileges and immunities/' are abusively used, as if they were synonymous. The word rights, is generic, common, embracing -whatever may be lawfully claimed. Privileges are special rights, belonging to the individual or class, and not to the mass; properly, an exemption from some general burden, obligation or duty; a right ■ peculiar to some individual or body. Immunities are rights of exemption only — freedom from what otherwise would be a duty or *307 burden:” Bates on Citizenship, 22. “These privileges and immunities,” said Washington, J., “may be all comprehended under the following general heads: protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind and to pursue and obtain happiness and safety; subject, nevertheless, to such restraints as the government may justly prescribe for the general good, of the whole.
The right of the citizen of one State to pass through or reside in any other State, for purposes of trade, agriculture, professional pursuits or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of every kind in the courts of the State; to take, hold and dispose of property, both real and personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the State; to which may be added the elective franchise, as regulated and established by the laws and Constitution of the State in which it is to be exercised: Corfield v. Coryell, 4 Wash., C. C., 380. These are some of the privileges and immunities intended to be guaranteed to the citizen, “subject,” says the learned Judge, “to such restraints as the government may justly prescribe for the general good of the Avhole.” There are many others not herein enumerated, and upon which the courts will decide as the cases arise: Conner v. Elliott, 18 How., 591. The right of intermarriage among the races is, in the opinion of the Court, not one of them. Nor is marriage a contract, in the sense of the Constitution, which may be “made and enforced.” It is called, in many of the books, a civil contract, for the want of a better *308 phrase.. A contract, in the sense of these enactments, is such an agreement as may be specifically enforced, like a contract to pay money or to deliver property. Marriage is a mere covenant of the will; it may be considered, while executory, a contract, the breach of which is expiated in damages; but it reposes upon the consent of the parties. If that consent is withdrawn, there is no such thing known to our law as its specific enforcement. It, therefore, differs essentially from that species of contract contemplated by the Constitution, which may be made and then enforced in the courts, and the obligation of which can not be impaired by the legislative department. In the ecclesiastical law, it is defined to be a covenant between a man and a woman, in which they mutually promise cohabitation and a continual care to promote the comfort and happiness of each other. It is an institution of God, and a very honorable state. The Saviour honored it by his presence, and at such a solemnity -wrought his first miracle; Buck Tlieo. l)ic., 261; Heb. xiii.; Gen. ii.; John iL “It is the civil status,” says Mr. Bishop, “of a man and a woman, united in law for life. In the sense in which it is dealt with by a decree of divorce, it is not a contract, but one of the domestic relations. It derives both its rights and its duties from a source higher than any contract of which the parties are capable; and as to these, it is uncontrollable by any contract they can make. Although it may be formed by a contract, yet when formed, it has none of the attributes of a contract, but becomes a domestic relation. And,” says he, “it is no more a contract than a fatherhood, or sonship, or serf *309 dom, or slavery, or apprenticeship, are contracts:” 1 Bish. Mar. & Div., 10. “Thus,” says Robertson, C. J., “marriage, though in one sense a contract, because, being both stipulatory and consensual, it can not be valid without the spontaneous concurrence of two competent minds, is, nevertheless, sui generis, and, unlike ordinary or commercial contracts, is publiei juris, because it establishes fundamental and most important domestic relations. And therefore, as every well organized society is essentially interested in the existence and harmony and decorum of all its social relations, marriage, the most elementary and useful of all, is regulated and controlled by the sovereign power of the State:” Maguire v. Maguire, 7 Dana, 181. It is said again, to be the particular glory of the social system; and the idea that any government could, consistently with the general weal, permit this institution to become merely matter of bargain between men and women, and not regulate it by its own power, is too absurd to require a word of refutation:” 1 Bish., 13; 2 Story’s Confl. Laws, § 108; 1 Id., § 200. The highest and holiest duty of every government is to provide for the happiness and general welfare of its people. How and in what manner this is to be best subserved, is a question for the political power; and the police power, which is inherent in all governments, is to be exercised without question. These powers, like privileges and immunities, heretofore considered in this opinion, can not well be enumerated. “The framers of the Constitution,” said Marshall, C. J., “did not intend to restrain the States in the regulation of their civil institutions, adopted for internal govern *310 ment; and the instrument they have given us is not to be so construed:” Dartmouth College v. Woodward, 4 Wheat., 518-629. These police powers of the State extend to every conceivable subject, where the good order, the domestic peace, the private happiness or public welfare of the people demand legislation. Unless that legislation is inhibited in the fundamental law, no State has acquitted itself of the duties of government without it. We hold that such legislation is not, never has been, and never should be, prohibited to the States, in reference to the intermarriage of the races. It has been repeatedly held by the Supreme Court of the United States, that a State may determine the status of persons within its jurisdiction: Groves v. Slaughter, 15 Pet., 419; Moores. Illinois, 14 How., 13; 11 Pet., 131; Story Const., §§ 1098, 1804, 1809. The right to regulate the institution of marriage, to classify the parties and persons who may lawfully marry, to dissolve the relation by divorce, and to impose such restraints upon the relation as the laws of God and the laws of propriety demand, has been exercised by all governments, and in all ages of the world. The discrimination as to race and people, in this most important institution, has been observed, even from the days of the patriarchs, and even as to different people of the same race. “Thou shalt not,” said Abraham, “take a wife unto my son of the daughters of the Canaanites, among whom I dwell; but thou shalt go unto my country, and to my kindred, and take a wife unto my son Isaac:” Gen. xxiv. The laws of civilization demand that the races be kept apart in this country. The progress of either does not depend *311 upon an admixture of blood. A sound philanthropy, looking to the public peace and the happiness of both races, would regard any effort to intermerge the individuality of the races as a calamity full of the sad dest and gloomiest portent to the generations that are to come after us. They are among us. They were ; faithful as slaves, and are becoming useful and valuable/ as laborers. There is scarce a family in the South that has not some memory, fresh and grateful, of affection and fidelity in these people during the late sad war. These should commend them to the protection and charity of our people. The courts will protect them in the enjoyment of every civil right guaranteed to the most favored citizen; for such we understand to be the sense of the amendments. Their rights, social, civil, political and religious, will be jealously guarded; but they must not marry or be given in marriage with the sons and daughters of our people. Such was the policy of our own legislation, as to bond and free, fifty years ago, and was at the time of the amendments in question. Such, also, were the laws of the British Colonies in this country, reenacted after the separation by the thirteen States. In Massachusetts, the Colonial act of 1707, entitled “An Act for the better preventing of a spurious and mixed issue/’ was reenacted under the State government in 1783, forbidding tlie intermarriage of the black and white races, and degrading the unhappy issue of such marriage with the stain of bastardy. > And long after the abolition of slavery in that State, in the carefully revised Code of 1836, this “mark of degradation/’ *312 says Taney, C. J., “was again impressed upon the race.” 19 How., 413. And such, indeed, we believe, was the law of every State. The Congress has the same right to regulate this relation in the District of Columbia and in the Territories, that the States have within their own jurisdictions; and this power is at this moment being exercised in Utah, in the suppression of polygamy. Ve are of opinion that the late amendments to the Constitution of the United States, and the laws enacted for their enforcement, do not interfere with the rights of the States, as enjoyed since the foundation of the government, to interdict improper marriages; and that the, act of 1870, c. 39, which forbids the intermarriage of white persons with negroes, mulattoes or persons of mixed blood, descended from a negro to the third generation, inclusive, and their living together as man and wife, in this State, is a valid and constitutional enactment.
Affirm the judgment.