Tlie opinion of the Court was delivered by
Bermudez, C. J.
This is a contest for the Succession of T. W. Colwell.
The application of the two legitimate sisters of the deceased to bo recognized as his nearest of kin, and, as snoli, put in possession of his estate, is opposed by certam children of his, who claim to be his forced and only heirs.
From a judgment against them, the sisters have appealed.
Tlie facts are, that the children who claim, to the exclusion of tlie sisters, are the issue of Colwell, who was a white man, with Delia MoCalop, who was a colored woman. They were conceived and born at periods when their authors were prohibited, on account of disparity of races, from contracting a legal marriage.
In August, 1878, the parties, who were domiciled in West Baton Rouge, wont to the Parish of St. Charles, where they entered into a marriage contract, in due form of law, wherein, naming their seven children, they acknowledged them “ to be tlieir own legitimate children.” They afterwards contracted marriage. Colwell subsequently died, (5th March, 1881,) leaving property valued at upwards of $(>0,000, and which is tlie cause of the contention in this controversy.
The question to be determined is simply, whether the marriage of T. W. Colwell and of Delia McCalop has legitimated those children.
It is a novel and important question, which has commanded our special attention, and which we feel satisfied to have solved in a •manner justified by law and consonant with the dictates of equity and of humanity.
It is clear that if, at the celebration of the marriage, Article 95 of the Civil Code of 1825 had preserved its original force, the question would be summarily solved in the negative, 10 A. 411; 11 A. 59; 15 A. 342 ; 30 Gratt. 858, as the marriage would have taken place in the very teeth of a local prohibitory law, and so would have been absolutely null. Federal legislation would be incompetent to control in such matters. 1 Woods, 537; 3 Heisk. 287 ; 36 Ind. 389; 42 Ala. 525; 53 *267 Ala. 150; 48 Ala. 195; 58 Ala. 190; Wade on Retroactive Law, §155; 18 Hou. 591; 3 Tex. A. App. 273.
The fact that the Article was expunged from the Revised Code of 1870, is highly significant and telling. It had in consequence ceased to have any vitality at the date of the marriage of Colwell, because repealed. In consequence of that repeal, the marriage could be and was legally contracted. 33 A. 1107. We do not consider that the correctness of this proposition is disputed by the litigants.
Their differences refer to the effects of the marriage. In other words, the litigants agitate the question, whether such a marriage could have produced such an effect as it would have occasioned if the parties could have contracted marriage at the conception of the children, born from their connections.
The character of those effects must be determined by an application of the laws in force at the date of the acknowledgment and of the marriage.
First of all those laws, was Article 2 of the Constitution of 1868, which declared, that “ all persons, without regard to race or color, or previous condition, shall enjoy the same civil, political and public rights and privileges, and be subject to the same pains and penalties.”
The laws themselves are: Article 198 of the R. C. C., which reads: “ Children born out of marriage, except those who are born from an incestuous or adulterous connection, may be legitimated by the subsequent marriage of their father and mother, whenever the latter have legally acknowledged them for their children, either before their marriage, by an act passed before a Notary and two witnesses, or by their contract of marriage.”
Article 19!): “ Children legitimated by a subsequent marriage, have the same rights as if they were born during the marriage.”
Art. 204, on the subject of acknowledgment of illegitimate children, provides: “Such acknowledgment shall not be made in favor of children whose parents were incapable of contracting marriage at the time of their conception.” This Article replaces Article 222 of the Code of 1825, which reads: “ Such acknowledgment shall not be made in favor of the children produced by an incestuous, or adulterous connection.”
Article 200; “A natural father, or mother, shall have the power to legitimate his or her natural children, by an act passed before a Notary and two witnesses, declaring that it is the intention of the parent making the declaration, to legitimate such child or children. But, only those natural children can be legitimated who are the offspring of parents, who, at the time of conception, could have contracted marriage.” Section 2173 of the Revised Statutes of 1870, which amends the fourth Partidas, as revived by the Act of 1831, p. 86, by changing *268 the word “ enable ” into “prevent," the amended portion now reading as follows:
“ Nothing herein contained shall be so construed as to prevent a white parent from legitimating a colored child,” etc., “ provided the natural children are the issue of parents who might, at the time of conception, have contracted marriage,” etc.
Act No. 68 of 1870, p. 96, which provides that: “ Natural fathers and mothers shall have the power to legitimate their natural children by acts declaratory of their intentions, made before a Notary and two witnesses, provided there existed at the conception of such children no other legal impediment to the inter-marriage of their natural father and mother, except those resulting from color, or the institution of slavery.”
The' second Section of this Act repeals all laws in conflict, except that of November 5th, 1868, relative to certain marriages.
The third Section declares that, the Act shall take effect from and after its passage.
It is clear that, notwithstanding the prohibitory language of Article 222 of the Code of 1825, a white father could have acknowledged his colored child, not the offspring of an incestuous or adulterous connection. The well reasoned opinion of Mr. Justice Simon, as the organ of the Court in Compton’s case, 12 R. 57, (7L,) resting on 4 La. 175, and 14 La. 545, and on a comparison with other Articles, and subsequently affhned in the case of Casanave, 21 A. 437, decided in 1869, puts the question beyond all possible doubt. 6 L. 470 ; 30 A. 1169.
Such was the condition of the law in 1870, when Act 68 was enacted. That Act, far from disturbing the expounded meaning of the previously existing legislation, on the power of acknowledgment by a white parent, of a colored child, enlarged that power by conferring upon the white parent the privilege of legitimation of such issue, on complying with certain prescribed formalities.
Act 96, which revises statutes of a general character, and which is known as the “Revised Statutes,” took effect under Section 3990 thereof. It contains no provision in conflict with the anterior legislation, or jurisprudence, or with Act 68 of 1870. Even if it did, the other statutes of that year would take precedence. 25 A. 216; Bishop on Stat. Or. Sec. 179. Instead of weakening that act, it expressly recognizes, in Section 2173, the same right of legitimation, declaring formally, at the same time, that nothing therein contained shall be construed as to prevent a white parent from legitimating his colored children.
Act 97 of 1870, which revises the Civil Code of 1825 and the amendments made to it, and which, under Section 3990, in case of conflict, is *269 to be tlie governing law, contains no disposition antagonistical or repugnant to the previous legislation, or jurisprudence, or to the regular Acts of 1870. On the contrary, its dispositions are ancillary to the objects contemplated under the new order of tilings.
The theory that Articles 200 and 204 of the R. C. C., and Section 2173 of the R. S. are limitative of the right of legitimation, by conferring it only on persons who could have contracted marriage at the conception of the issue, is inadmissible. It is a fallacy which consists in assuming that, considerate laws passed at the same session can be designed to accomplish a certain purpose, and without any apparent or plausible reason, to defeat that object at the same time. It is the result of a confusion of ideas on the subject. If it were a wholesome proposition, then the special law of 1870 (No. 68) and Section 2173 of the R. S., and Articles 200 and 204 of the R. C. C., would simply mean that a white parent, or a white and a colored parent, could and could not acknowledge or legitimate a colored issue.
We consider that the restriction found in Section 2173, R. S., and in Articles 200 and 204 of the R. C. C., must be construed and read together with Article 198 of the R. C. C., as laws in pari materia, R. C. C. 17, 18. If so construed and read, they can be made to apply solely to children begotten from an incestuous or adulterous connection, and to exclude such only from the benefit of legitimation.
If there existed any conflict between the Revised Civil Code and the Revised Statutes, on the one hand, and the Special Act No. 63 of 1878, on the other, the latter should predominate, under the very terms of the Special Act of the same year, which formally declares that all the Acts and Joint Resolutions passed during the session of that year, which may be contrary to, or in any manner conflict with the Acts of the same session, known as “ the revision of the Statutes of a general character and of the Civil Code and Code of Practice,” shall have precedence of said revisions, and be held as the law in opposition thereto, and as repealing those Acts, as far as they may be in opposition or conflict. 25 A. 216 ; Bishop on Stat. Or. 179.
The object which the legislature of 1870 intended to accomplish by enacting the several laws passed by it, whether found in the R. S., or in the R. C. C., or in the regular session Acts, on the subject of legitimation, unmistakably was to authorize a white parent to legitimate an acknowdedged colored issue, either by contracting or without contracting marriage, provided such issue be neither incestuous nor adulterous. That legislation has authorized the creation of legitimate and forced heirs, by persons who without it could not have done so, making heirs, those who, in its absence, could not have been such. 8 R. 422.
It is impossible to conceive upon what principle it can be plausibly *270 claimed that tlie Revised Code proposed to reinstate, in this respect, the legislation previously in existence, and which the new order of things was designed to extinguish. The whole theory upon which the government was reorganized, as concerns the rights of persons in that particular, militates so powerfully against the pretensions of the petitioners, that it irresistibly destroys them completely. The law does not favor repeals by implication.
The juxtaposition of the different texts of the laws on the subject before us, clearly repels the theories advanced in antagonism of the rights of the opponents.
The Constitution of 1868, and the Statutes subsequently passed, which we have quoted, were designed to concede to all persons, without distinction or difference of race, or color or previous condition, the privileges of legally inter-marrying and thereby legitimating their previously acknowledged issue, and also of legitimating such offspring without contracting marriage, whether the other parent was living or dead, privileges which they did not enjoy before, imposing- these essential conditions, however, that the persons contracting marriage be not related within the prohibited degrees ; (Arts. 94 and 95); or bound by conjugal ties ; (Art. 93); or otherwise proscribed; (Art. 161); and that the acknowledged legitimated issue be not the fruits of adulterous or incestuous connection; (Art. 218); the children thus legitimated, to have the same rights as if bom during wedlock; (Art. 199, R. C. C.)
The Constitutional and Statutory provisions which we have considered, are in the nature of Statutes of indemnity, oblivion and pardon, and produce similar effects. 49 Mo. 17; 41 Mo. 184; 8 Wall. 595; 3 Serg. & R. 590, 598, (Penn.); 1-Binn. 601.
They may be assimilated on principle to naturalization laws. On that subject, the authorities are that, although an alien is not permitted to acquire land, still, that when naturalized, the naturalization relates back to and confirms the title to the land so purchased. Bouvier L. D. verbo Alien ; Paschal Annotated Const. 112 294; Morse on Citizenship, 77 ; 9 Wheat, 751; 1 Johns N. Y. Ch. p. 399.
It has been well held in this State, under a different regime, that “ emancipation gives to the slave his civil rights and a contract of marriage, legal and valid by the consent of the master and the moral assent of the slave, from the moment of freedom, although dormant during the slavery, produces all the effects which result from such contract among free persons.” 6 M. (O. S.) 559. See 25 A. 617.
The analogous question, whether incestuous children could be legitimated by the marriage of their parents, authorized by sovereign dispensation, after being a fruitful source of discussion among jurists, was conclusively determined in the affirmative in 1867, by the Court *271 of Cassation of Prance, t-lien presided over by Mr. Troplong. The Court held that such marriages legitimate the issue in radice. The three rulings made in that year were subsequently affirmed in 1868, 1874, and again lately in 1879. Those decisions are in accord with those of the Parliaments of Paris of 11th May, 1665, 17th April, 1711, 4 th June, 1725, 25th Aug. 1738, and with the opinions of distinguished commentators and jurists. Vide J. P. 1867, pp. 113, 1122; 1868, p. 1020; 1874, p. 260; 1380, p. 210 ; vide also, Purgóle Test. t. 1, p. 373; Lebrun Sue. L. 1 Ch. 2, Sec. 1, Dist. 1, Nos. 12 and 13; Domat Lois Civiles, part 3, Ch. 5, duMar. Art. 24, No. 76; Pothier Cont. Mar. No. 414; Maleville Anal. C. C. T. 1, sur l’Art. 331; Toull. 2, No. 932; Demolombe, T. 5, No. 355; Duranton, v. 3, N. 177; Pont. Rev. do leg. and de jur. v. 8, p. 150; Albert verbo Mar. Art 6; Magnin des Minorites, 81 and 82.
The principles consecrated by a tribunal of the highest respectability and previously admitted by authors of undoubted superiority, can safely be applied to a controversy, in pari materia, which presents the unusual feature of a plenary sovereign dispensation from an otherwise annulling impediment.
We cannot subscribe to the theory advanced by the collateral relatives, that the marriage in this case was celebrated in violation of law, and so could produce no effect. They charge that it took place in the parish of St. Charles and not in that of West Baton Rouge, which was the place of the domicil of the parties, and that it was not solemnized with the authority of the officers empowered to issue marriage licenses in that place.
The provisions of the law to which they refer are directory. 30 A. 1169.
The authorities in 4 A. 375 and 12 A. 367, are to the. effect that, when minors contract marriage out of the State, without the consent of their tutors, and therefore in violation of our law, such marriage does not emancipate them, so as to confer upon them the rights which they would have had, if they had been dispensed from the time required to attain their majority, or if the marriage had taken place with the consent of the tutor.
In the first case, in which a family meeting had refused to emancipate the minor, for good reasons stated, it was well observed that through motives of public policy, the law does not pronounce the nullity of such marriages, but that it is equally against the sanie policy that they should be held to confer upon the parties in default, all the rights which result from the marriage of minors when legally contracted.
*272 In the second case, in which the minor had gone to a neighboring State to evade our laws, which required the consent of the tutor, the Court wisely remarked, that emancipation is the consequence of an authorized marriage, and not of one made in fraud of our laws; that the Courts of another State cannot emancipate minors whose domicil is here, and that such marriage there, in contravention with our laws, cannot produce any greater effect towards the emancipation of the minor.
We are unable to discover what bearing those authorities can have to the present case, in which no law was violated and in which no punishment can be inflicted.
The result of the contrary doctrine contended for would be, while recognizing the validity of such marriages, to deny to them all and any effect, a consequence so subversive of the teaching that the law favors marriages, that it must be repelled.
The doctrine is perfectly wholesome. Had it not been declared and applied as it was, the consequence would have been an encouragement to ill inclined and unbridled minors to disregard the will of those in charge of them. It would have proved an authority to them to override and evade the law, and by so doing, to reap indirectly advantages which they could not have realized directly.
The philosophy in those cases is not at all that which underlies the principles governing the present litigation.
A marriage contracted, as was that in this instance, is not only licit but legal, and produces the same effect as if contracted at the domicil of the parties, and solemnized with the sanction of, or by the competent authority there. 4 A. 375; 12 A. 367.
We therefore conclude, that the marriage of the parties was authorized by law; that they had previously duly acknowledged their children: that their marriage has legitimated those children, who enjoy the same rights which they would have had if begotten by persons wholly of white or colored descent, fully capable of contracting alegal marriage, and had they been born during lawful wedlock.
Under this ruling, the collateral relatives are not entitled to the estate of the deceased, which therefore accrues to the opponents, as his legitimate and sole heirs.
The appellants complain that the judgment of the lower court was rendered ultra petitum, when it ordered the administratrix, widow Colwell, to file an account. It is claimed that, there being no prayer in any part of the pleadings for any such relief, the judgment should be reversed.
The appellants are the collateral relatives of the deceased. The record does not show that the administratrix is an appellant, or has *273 prayed for an amendment of the judgment, or that she is represented by the counsel of those relatives. The appellants cannot be heard thus to champion vicariously, the rights of the administratrix and insist in her behalf upon a relief, for which she does not appear to be over sanguine.
We find no error in the judgment; appealed from, which is therefore affirmed with costs.