**UNITED STATES ex rel. WESSELS v. McDONALD, Commandant of Brooklyn Navy Yard.**

(District Court, E. D. New York. March 2, 1920.)

1. **Habeas corpus** ⬤≈79—**Return imports verity until impeached.**
    In the federal courts, a return to a writ of habeas corpus is deemed to import verity until impeached.

2. **Army and navy** ⬤≈2—**Congress authorized to provide for punishment of military and naval offenses.**
    Under Const. art. 1, § 8, cls. 11–14, 18, Congress may provide for the trial and punishment of military and naval offenses in like manner with the practice in force in civilized countries, and the power to do so is independent of the judicial power, defined in article 3.

3. **Army and navy** ⬤≈49—**Proceedings of courts-martial cannot be revised, altered, or controlled.**
    Courts-martial form no part of the judicial system of the United States, and the proceedings therein, if confined within the limits of their jurisdiction, cannot be revised, altered, or controlled by the civil courts.

4. **Army and navy** ⬤≈3—**Civil courts may have jurisdiction of offense concurrent with courts-martial.**
    The civil courts may have jurisdiction of offensive conduct, which constitutes a crime under the civil or statutory law, which may be concur-

⬤≈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rent with the jurisdiction of courts-martial for the offense, which would be triable before a court-martial.

5. **Habeas corpus ⟨⟩17, 94—Jurisdiction only question, where relator restrained by court-martial.**

Where the relator, brought before a civil court by writ of habeas corpus, is restrained of his liberty by a court-martial proceeding, the sole inquiry is whether the court-martial has jurisdiction to try him, and a relator regularly in custody, awaiting trial by court-martial, is not entitled to relief.

6. **Habeas corpus ⟨⟩27—Person not amenable to jurisdiction of court-martial may be discharged.**

The civil courts may discharge a person from sentence of a court-martial on habeas corpus, if he was not amenable to its jurisdiction.

7. **Army and navy ⟨⟩44(1)—Jurisdiction of courts-martial is complete and plenary over military offenses.**

Courts-martial possess the same full, complete, and plenary jurisdiction over offenses against military law as civil courts over controversies within their cognizance, and are supreme while acting within their exclusive jurisdiction.

8. **Army and navy ⟨⟩44(1)—Jurisdiction of courts-martial limited and special.**

The jurisdiction of courts-martial is limited and special.

9. **Army and navy ⟨⟩43—Court-martial ceases to exist when purpose is accomplished.**

A court-martial being called into existence for a temporary and special purpose, and to perform a special duty, when the object of its creation is accomplished, it ceases to exist.

10. **War ⟨⟩32—Statute regarding spies applies, regardless of citizenship.**

Rev. St. § 1343, art. 82, as amended (Comp. St. § 2308a), providing that any person, who in time of war shall be found lurking or acting as a spy in or about fortifications, etc., shall be tried by court-martial or military commission, and on conviction suffer death, being general in its terms, is applicable to all persons acting as spies, whether citizens or not.

11. **Army and navy ⟨⟩2—War ⟨⟩31—"Military law" and "martial law" distinguished.**

Military is distinct from martial law, in that it applies only to persons in the military or naval service of the government; whereas, martial law, when once established, applies alike to citizens and soldiers.

[Ed. Note.—For other definitions, see Words and Phrases, Martial Law; Military Law.]

12. **Army and navy ⟨⟩2—War ⟨⟩31—"Military law" and "martial law" defined.**

"Martial law" is the will of the commanding officer of an armed force or geographical military department, which, in time of war, may be expressed within the limits of his particular military jurisdiction, and may be enlarged or restrained by his military chief or supreme executive; while "military law" consists of the rules and regulations made by the legislative power for the government of the land and naval forces.

13. **Constitutional law ⟨⟩82—Constitutional guaranties do not apply to offense of being a spy; "crime."**

The guaranties of the Constitution (Const. Amends. 5, 6) apply only where a crime is charged, and a "crime" means an offense against the government, as understood when the Constitution was adopted, and does not include the offense of being a spy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Crime.]

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. War ⬯⬯11—Spying not offense under international law, unless spy captured in act.

Under international law, spying is not a crime, and the offense against the laws of war consists of being found during the war in the capacity of a spy.

15. War ⬯⬯32—Naval court-martial has jurisdiction to try spy arrested in New York City.

Under article 5 of the Articles for the Government of the Navy, providing that all persons who in time of war come or are found in the capacity of spies, or bring or deal in seditious letters or messages from any enemy, etc., shall suffer death or other punishment, as a court-martial may adjudge, the jurisdiction of a naval court-martial to punish a German spy, who entered the United States under a false name and on a forged passport, and who was arrested in New York City, cannot be denied on the ground that the port of New York was outside the field of active operations and outside the theater of war.

Habeas corpus by the United States, on the relation of Herman Wessels, against John D. McDonald, Commandant of the United States Navy Yard, Brooklyn, N. Y. Writ dismissed.

Thomas J. O'Neill and William H. Daly, both of New York City (Leonard F. Fish, of New York City, and William F. Lally, of Yonkers, N. Y., of counsel), for relator.

Leroy W. Ross, U. S. Atty., of Brooklyn, N. Y., and Robert E. Adams, Judge Advocate (Charles J. Buchner, of Brooklyn, N. Y., and George Winship Taylor, of Baltimore, Md., Asst. U. S. Attys., of counsel), for respondent.

MANTON, Circuit Judge. The relator sued out this writ of habeas corpus, demanding his discharge. In his petition, he alleged that he was a resident of Yonkers, Westchester county, N. Y., and that he has been deprived of his liberty without warrant of law. He relates that he has been indicted by the grand jury of the Southern district of New York on three separate charges of crime, which are referred to hereafter. He details, in particularity, as to what transpired from the moment of his apprehension until suing out this writ. He specifies his arrest as having taken place in the city of New York, and alleges that the courts in that locality were functioning, and declares that it was at no time under martial law. He declares that the United States was not in the "theater of warfare," and concludes that the court-martial has not jurisdiction to try him on the charge of being a spy.

The return alleges, among other things:

"(a) In January, 1918, the relator called at the office of the Department of Justice, of the United States in the borough of Manhattan. He then stated to William T. Sanders, Jr., special agent of that department, that he, the relator, was a citizen of Switzerland, and that he was in New York on business connected with Richter & Co., manufacturers of toy stone building blocks and patent medicines, with offices at 74 to 80 Washington street, New York City. The relator was shown several letters, which were then under investigation by the Department of Justice, and stated that they were not for him, and he knew nothing about them. The relator also exhibited to the said agent what appeared and purported to be a Swiss passport, and stated that it was his

⬯⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

passport issued to him by the Swiss government. He was thereupon allowed to depart. He is a native of Germany, and, at the time of said visit to the Department of Justice, was a subject of the Imperial German government and an officer in the Imperial German navy. He was not then and never has been a citizen of the Swiss republic. The passport which he exhibited was forged, and known by the relator to be forged. The letters which were under investigation by the Department of Justice were in fact intended for and directed to the relator, having been theretofore sent to him by agents of the Imperial German government.

"(b) In April, 1918, the relator again visited the said office of the Department of Justice. He then saw Daniel Davidson, special agent of that department, and stated to said agent that he was a citizen of Switzerland, and exhibited his beforementioned forged Swiss passport and was thereupon allowed to depart.

"(c) On May 1, 1918, the relator was arrested by Harry Jentzer, special agent of the Department of Justice of the United States. He then made to said agent substantially the same statement he had previously made to Agents Sanders and Davidson. Throughout the period of time involved, relator stated to all the representatives of the Department of Justice and of the government of the United States with whom he came in contact that he was a citizen of Switzerland; that his true name was Carl Rodiger; that he was in the United States on business connected with Richter & Co., all of which was false, and known by the relator to be false.

"(d) On and after April 6, 1917, the relator was an alien enemy within the meaning of section 4067 of the Revised Statutes of the United States. He did not register as such alien enemy as required by law and by the proclamation and regulations of the President of the United States issued pursuant to said section.

"(e) On May 1, 1918, the relator was arrested as an alien enemy. Throughout the period from that date until January 30, 1920, when he was apprehended by direction of the Secretary of the Navy as aforesaid, he was confined in the Tombs Prison in the borough of Manhattan and held as an alien enemy under a warrant duly issued in accordance with the said proclamation and regulations of the President pursuant to section 4067 of the Revised Statutes of the United States.

"3. Indictments were returned against the relator and others in the District Court of the United States for the Southern District of New York, in substance upon the charges and in the form summarized in Exhibits A, B, and C to the petition, and to said indictments the relator entered pleas of not guilty. Except as herein specifically admitted, this respondent on information and belief denies each and every allegation contained in paragraph 3 of the petition.

"4. The abstracts annexed to the petition as Exhibits A, B, and C are substantially correct summaries of said indictments, but for greater certainty this respondent produces and files herewith as parts of this return full copies of such indictments, marked Exhibits V, VI, and VII, respectively.

"5. Upon information and belief, the petitioner has never been in the land forces, naval forces, militia, or public service of the United States; ever since November, 1916, he has been in the United States, and for most of that period within the Southern district of New York, as an officer of the Imperial German navy and agent of the German government, and ever since April 6, 1917, as a spy of the Imperial German government; since November, 1916, within the Southern district of New York, the courts of justice have been open, their process has not been obstructed, and there has been therein no rebellion, invasion, military government, or martial law. Except as herein specifically admitted, this respondent, on information and belief, denies each and every allegation contained in paragraph 6 of the petition.

"6. On information and belief, in accordance with the direction of the Attorney General of the United States, duly authorized thereto by the proclamation and regulations of the President issued pursuant to section 4067 of the Revised Statutes of the United States, the United States marshal for the Southern district of New York, through one of his deputies, delivered the petitioner at the City Prison in the borough of Manhattan to an officer of the United

States navy, by whom he was transported to the Brooklyn Navy Yard prison, where he has ever since been and now is held in the custody of this respondent, in manner and form and under authority and process as hereinbefore alleged, and where on January 31, 1920, he was served with the charge and specifications as hereinbefore alleged. This respondent has no knowledge or information sufficient to form a belief as to what statement was made to petitioner by his attorney, and, except as herein specifically admitted, on information and belief, denies each and every other allegation contained in paragraph 7 of the petition."

To the return a traverse has been filed which sets forth:

"That the return made and filed * * * is void and of no effect, said detention being in violation of your petitioner's rights, privileges, and immunities under the Constitution and laws of the United States, for the reasons set forth in the petition for the issuance of said writ, to which your petitioner here now refers with the same force and effect as though the said petition were incorporated herein and set forth at length."

[1] In the federal courts, a return to a writ of habeas corpus is deemed to import verity until impeached. Crowley v. Christensen, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620. The relator here does not impeach the return by his traverse, but in effect demurs thereto, saying that, admitting what is set forth, it is not a sufficient answer to the petition and writ. It thus appears from the return that the relator was an alien enemy and an officer of the German navy. His advent to this country was in November, 1916, and then as an agent of the Imperial German government, and since then he has continued to act as such agent. Masquerading under a false name, he gained admission to this country on a forged passport. He said his name was Carl Rodiger, a citizen of Switzerland, and asked protection under a passport issued by that government. From the return it appears that from April, 1917, until he was apprehended and imprisoned on May 1, 1918, he acted as a German spy. Since May 1, 1918, until May 30, 1920, he has been held as an alien enemy under the act of Congress, and was a prisoner in the Tombs Prison, New York City. The order for his arrest was a presidential warrant issued pursuant to section 4067 of the United States Revised Statutes (Comp. St. § 7615). When arrested he was found in the borough of Manhattan, city of New York. On January 30, 1920, he was arrested by the Naval authorities on the charge of being a spy, and is now to be tried by a court-martial of the navy. He has been served with charges and specifications and notified of his rights. His hope in suing out this writ of habeas corpus is based upon the protection of the Fifth and Sixth Amendments to the Constitution. They read as follows:

"Article V. No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; * * * nor be deprived of life, liberty, or property, without due process of law. * * *"

"Article VI. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have com-

pulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

The United States entered war on April 6, 1917, and actual hostilities continued until the Armistice was signed. In June, 1918, the relator, with one A. P. Fricke and W. J. Robinson et al., were indicted on the charge of conspiracy to commit espionage in time of war. They were also indicted for conspiracy to commit treason. In December, 1918, he was indicted for treason. To each of these indictments he has pleaded not guilty and has never been brought to trial. His codefendants, Robinson and Fricke, have been tried and acquitted of the charge of treason.

The acts of Congress of April 10, 1806 (chapter 20) and August 29, 1916 (Rev. Stat. § 1342 [Comp. St. § 2308a]) incorporated in the Articles of War, were in force and effect at the time it is alleged that the relator acted as a spy in the city of New York. This article, which is for the government of the army and navy, was in effect for over a century at the time of the offense committed by the relator. The enactments are as follows: Article 82, Rev. Stat. § 1343; Act April 10, 1806, c. 20, § 2, 2 Stat. 371; Act Feb. 13, 1862, c. 25, § 4, 12 Stat. 340; Act March 3, 1863, c. 75, § 38, 12 Stat. 737; Act Aug. 29, 1916, c. 418, § 3, 39 Stat. 663. It now reads:

"Any person who in time of war shall be found lurking or acting as a spy in or about any of the fortifications, posts, quarters, or encampments of any of the armies of the United States, or elsewhere, shall be tried by general court-martial or by a military commission, and shall, on conviction thereof, suffer death."

Section 1624 of the Revised Statutes, Comp. St. § 2961 (2 Stat. 47, art. 12; 12 Stat. 602, art. 4) provides:

"All persons who, in time of war, or a rebellion against the supreme authority of the United States, come or are found in the capacity of spies, or who bring or deliver any seducing letter or message from any enemy or rebel, or endeavor to corrupt any person in the navy to betray his trust, shall suffer death, or such other punishment as a court-martial may adjudge."

An examination of the charge against the relator indicates that he is charged with a violation of article 5 of the articles for the government of the Navy. That Congress has power to legislate, granting the right of trial by court-martial of all persons found in the capacity of spies, finds support in the Constitution. Pursuant to the war powers of Congress found in article 1, § 8, clauses 11, 12, 13, 14, and 18 of the Constitution, Congress has the power (a) to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; (b) to raise and support armies; (c) to provide and maintain a navy; (d) to make rules for the government and regulation of land and naval forces; (e) to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by the Constitution in the government of the United States or any department or officer thereof.

[2-4] These provisions indicate that Congress has the power to provide for the trial and punishment of military and naval offenses

in like manner with the practice in force and effect in civilized countries; the power so to do in Congress is without any connection between it and the third article of the Constitution, defining the judicial power of the United States; the two powers are independent of each other. Dynes v. Hoover, 20 How. 65, 15 L. Ed. 838. Courts-martial form no part of the judicial system of the United States, and the proceedings therein, if confined within the limits of their jurisdiction, cannot be revised, altered, or controlled by the civil courts. Kurtz v. Moffitt, 115 U. S. 487, 6 Sup. Ct. 148, 29 L. Ed. 458. The civil courts cannot command or regulate the army. Reaves v. Ainsworth, 219 U. S. 296, 31 Sup. Ct. 230, 55 L. Ed. 225. The civil courts may have jurisdiction of offensive conduct which constitutes a crime under the civil or statutory law, which may be concurrent with the jurisdiction of the courts-martial for the offense which would be triable before a courts-martial. Franklin v. U. S., 216 U. S. 559, 30 Sup. Ct. 434, 54 L. Ed. 615; Grafton v. U. S., 206 U. S. 333, 27 Sup. Ct. 749, 51 L. Ed. 1084, 11 Ann. Cas. 640.

[5-9] Where the relator is brought before the civil court, when he is restrained of his liberty by a court-martial proceeding, the sole inquiry is whether the court-martial has jurisdiction to try the petitioner (Ex parte Reed, 100 U. S. 13, 25 L. Ed. 538; Johnson v. Sayre, 158 U. S. 109, 15 Sup. Ct. 773, 39 L. Ed. 914; Mullan v. U. S., 212 U. S. 516, 29 Sup. Ct. 330, 53 L. Ed. 632), and courts may discharge a person from sentence if it appears that he was not amenable to its jurisdiction (U. S. v. Grimley, 137 U. S. 147, 11 Sup. Ct. 54, 34 L. Ed. 636). It cannot avail a relator to proceed, if he is regularly in custody awaiting trial by court-martial. In re Davison (C. C.) 21 Fed. 618. Courts-martial possess the same full, complete, and plenary jurisdiction over offenses committed against military law as civil courts of the country possess over controversies within their cognizance (Carter v. McClaughry, 183 U. S. 365, 22 Sup. Ct. 181, 46 L. Ed. 236), and while acting within the sphere of such exclusive jurisdiction, they are supreme (Carter v. Roberts, 177 U. S. 496, 20 Sup. Ct. 713, 44 L. Ed. 861). The jurisdiction is limited and special. However, the court being called into existence for a temporary and special purpose and to perform a special duty, when the object of its creation is accomplished, it ceases to exist.

[10] The relator here contends that the United States was a field without the "theater of war" at the time of his activities during which it was said he was a spy; that the courts of the United States were functioning and, that he is in fact charged with crime, and is entitled, under the Fifth and Sixth Amendments, to a trial by judge and jury, clothed with all the protection that these provisions of the Constitution bestow upon a defendant. He says he finds support for this contention in Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281. The offense of being a spy is, by statute, one of a purely military character, cognizable only in time of war and before a tribunal having its life, existence, and authority created, continued, and defined by purely military power. U. S. Rev. Stat. 1343 (Comp. St. § 2308a, art. 82). This statute, being general in its terms, is applicable to all persons

acting as spies, whether citizens of the United States or not. Prior to this, it was held that an American citizen could not be tried by a United States military court for the offense of being a spy (Smith v. Shaw, 12 Johns. [N. Y.] 257), and a person could not be tried after the restoration of peace, for the offenses alleged to have been committed during the existence of war (In re Martin, 45 Barb. [N. Y.] 142). But at this time we are still at war.

In the United States, the earliest exercise of national authority by Congress, in the form of positive legislation, was the enactment of rules and articles of war for the government of the army and the rules and regulations for the government of the navy, by which the entire authority over both these branches of the public service was assumed by Congress and enforced by courts-martial, without reference to local tribunals. The separation of the land and naval forces from connection with the civil courts, and the method of punishment of offenses committed within either by the appropriate courts-martial, was presumed and maintained under the Confederation, while that government continued. U. S. v. Mackenzie, Fed. Cas. 18,313. The rules and regulations of war were fashioned from the British Mutiny Acts, and those of the navy were likewise taken from the British enactments.

[11, 12] There is recognized a distinction between the military and martial law. Military is distinct from martial law, in that it applies only to persons in the military or naval service of the government; whereas martial law, when once established, applies alike to citizens and soldiers. Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281. Martial law is the will of the commanding officer of an armed force or of a geographical military department, which, in time of war, may be expressed within the limits of his particular military jurisdiction, and this such as necessity demands and prudence dictates. It may be enlarged or restrained by his military chief or supreme executive, while military law is the rules and regulations made by legislative power of the state for the government of its land and naval forces.

In the Milligan Case, the petitioner, a citizen and resident of the state of Indiana, was imprisoned in a military prison at Indianapolis and placed on trial before the military commission convened at Indianapolis by order of the general there in charge. The offenses charged were conspiracy against the government of the United States, affording aid and comfort to rebels against the authority of the United States, inciting insurrection, disloyal practices, and violation of the laws of war. Upon conviction of these charges, he was sentenced to be hanged. The Supreme Court granted his release on a writ of habeas corpus. The military commission was provided for by an act of Congress. It appears that at the time of his trial the federal court for that district convened and was able to make its decisions and carry out its mandates. Milligan contended that he was deprived of his constitutional rights of a trial in a civil tribunal and a trial by a jury. His claim was supported, and the Supreme Court held that he was deprived of the guaranty of trial, contained in the Constitution; that the right of trial existed in time of war, as well as in

time of peace, and this since the federal authority was unopposed in the state of Indiana and the federal courts were open for trial of offenses and the redress of grievances thereof; the usages of war could not, under the statute, afford any sanction of a trial there of a citizen in civil life and not connected with the military or naval service by a military tribunal for any offense whatever. It was further held, by the majority of the court, that the Congress could not disturb one of the safeguards of civil liberty incorporated into the Constitution, except the right of suspension of the writ of habeas corpus, and that the military commission organized during the Civil War in a state not invaded and not engaged in rebellion, in which the federal courts were open and in proper and unobstructed exercise of their judicial functions, had no jurisdiction to try, convict, or sentence, *for any criminal offense*, a citizen who was neither a resident of a rebellious state, nor a prisoner of war, nor a person in the military or naval service, and that Congress could not invest them with any such power.

[13] While it is true that, in the case at bar, the relator was charged with a criminal offense by indictments of the federal courts, this arrest is not in pursuance of any intention seeking to bring the defendant to justice on any of the charges for which he has been indicted. He is now being charged with the offense of being a spy. The guaranties of the Constitution apply only where a crime is charged. Crime means offense against the government, as understood when the Constitution was adopted. There was no such crime known to the law as that of a spy then. In the Matter of Martin, 45 Barb. (N. Y.) 142, where a military prisoner, charged with being a spy, was released on a writ of habeas corpus by reason of the fact that after the offense he had returned to the enemy lines, the court said:

"The offense of being a spy is not known to the civil or statutory law, and is one of a purely military character, cognizable only in time of war, and before a tribunal having its life, existence, and authority created, continued, and defined by purely military power."

[14] A spy may not be tried under the international law when he returns to his own lines, even if subsequently captured, and the reason is that, under the international law, spying is not a crime, and the offense which is against the laws of war consists of being found during the war in the capacity of a spy. Martin v. Mott, 12 Wheat. 19, 6 L. Ed. 537. There the court held that the offense of being a spy is cognizable exclusively by military tribunals under the laws of nations.

"Spies are persons who, in disguise or under false pretenses, insinuate themselves on the enemy in order to discover the state of his affairs, to pry into his designs, and then to communicate to their employers the information thus obtained." Halleck's International Law, vol. 2, pp. 30, 31.

An alien serving as a spy is not guilty of any crime against the country which he is seeking to undermine by his acts or conduct as the term "crime" is used in the international law. Of course, if he serves as a spy against his own sovereignty, he may be found guilty of crime under the law. Military usages universally permit the execu-

tion of a spy, and this procedure is not to be considered only as visiting punishment upon the individual, but as a means of prevention. When an alien is taken after a hostile entrance into a country, he should be dealt with as an enemy, rather than as a traitor, because he violates no trust or allegiance.

The contention of the relator cannot be supported by the Milligan Case. All that was held in that case was that the military commission was without valid legislative authority, and that the attempt to enforce the martial law was not warranted by the then existing circumstances. Here the enactment of Congress expressly confers jurisdiction for the trial of a spy upon the naval courts-martial. Milligan was not charged with a violation of the Articles of War, nor with any statute creating or conferring jurisdiction upon the tribunal by which he was tried. Indeed, counsel contends that, because Wessels' activities were in the United States, rather than in Europe, where fighting was actually going on, and that the federal courts here were functioning, he cannot be tried by courts-martial, but, for the same acts, if perpetrated in the field of hostilities of war, he could be tried by courts-martial as a spy.

A spy is defined, under the article of The Hague, adopted July 29, 1899, as an individual acting clandestinely or on false pretenses, who obtains, or seeks to obtain, information in the zone of operations of a belligerent with the intention of communicating it to the hostile party. Convention Respecting the Laws and Customs of War on Land, The Hague, July 29, 1899, 32 Stat. vol. 2, pp. 1818, 1819. In Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, Chief Justice Chase said:

"There are under the Constitution three kinds of military jurisdiction: One to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of the United States, or in time of rebellion and civil war within states or districts occupied by rebels treated as belligerents; and a third to be exercised in time of invasion or insurrection within the limits of the United States, or during rebellion within the limits of the states maintaining adhesion to the national government, when the public danger requires its exercise. The first of these may be called jurisdiction under military law, and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as military government, superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated martial law proper, and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights."

[15] Military authorities should have power to try spies wherever found; otherwise they may not be subject to trial for that offense. In this great World War through which we have just passed, the field of operations which existed after the United States entered the war, and, especially in regard to naval operations, brought the port of New York within the field of active operations. The implements of warfare and the plan of carrying it on in the last gigantic struggle placed the United States fully within the field of active op-

erations. The term "theater of war," as used in the Milligan Case, apparently was intended to mean the territory of activity of conflict. With the progress made in obtaining ways and means for devastation and destruction, the territory of the United States was certainly within the field of active operations. Great numbers of troops were being sent abroad, and, in larger numbers, sailing from the port of New York. Vessels loaded with ammunition and supplies for the army were daily, and frequently in a day, leaving this port. German submarines were landing unheralded and unaware in our ports, before the United States entered the war. Ships were being destroyed within easy distance of the Atlantic coast; there was the constant threat of and fear for airships above the harbor and the city of New York on missions of destruction. A spy of the enemy might well have aided these hostile operations. It is not necessary that it be said of the accused that he entered forts or armed encampments in the purposes of his mission. But such we had in large establishments. It is sufficient if he was here on the mission of a spy and communicated his intelligence or information to the enemy.

One of the lessons taught by this war is that the ocean is no longer a barrier for safety or an insurance against America's being involved in European wars. She cannot now become an asylum of safety for spies. This war was not carried out by naval and military forces only. Intrigues played a large part. New and useful methods of communication with the enemy were devised and in existence which did not exist in other wars. Wireless telegraphy, signaling by light, the successful use of carrier pigeons, were found to be useful instruments of warfare by the Germans. These methods of operation and assistance created a greater danger flowing from the activities of spies. Their existence in our midst helped propaganda for unrest, suspicion, created doubts of victory, and made it possible to place bombs on ships sailing from this port. They were also handy in the distribution of moneys to the innocent or guilty who participated with them in their work of destruction. Their presence in our midst was not for the welfare of the country. They were dangerous agencies of war, and it is proper that the naval authorities deal with them as the act of Congress provides the courts-martial might. Whatever may be the right of an alien to protection of the law in this country, he surrenders this right to constitutional protection when he joins the armed forces of an alien enemy, assuming his duties as a spy.

The writ is dismissed, and the prisoner remanded.