## BISHOP *v.* VANDERCOOK.

1. MILITIA—NOT EXEMPT FROM ACTION FOR WRONGS INFLICTED ON CITIZENS—STATUTES.

Section 41, Act No. 53, Pub. Acts 1917, construed, and *held*, not to exempt members of the State troops in actual service in aid of civil authority in time of peace from civil accountability for wrongs committed, except by direct

On civil and criminal responsibility of soldiers and militiamen, see note in L. R. A. 1915A, 1141.

order of the governor, but said statute marks the relation to be sustained between the troops and the civil authorities, and, while it stays interference by the civil authorities, it does not close the courts to persons wronged by military lawlessness.[1]

2. SAME—MILITARY LAW AND MARTIAL RULE DISTINGUISHED.

Military law is enacted for the organization, government, and discipline of troops, and applies only to persons in military service, while martial law or rule applies to all persons and property within a district subject to it.[2]

3. SAME—MILITIA WHEN AIDING CIVIL AUTHORITIES MUST ACT WITHIN CIVIL LAW.

When proper civil authority invokes military aid, it is extended as an aid, and must act within, and in accordance with, the civil law, and while soldiers are subject to military law, that fact does not take away from citizens the rights and remedies for injuries arising through wrongful exercise of military law or power.[3]

4. SAME—MARTIAL RULE CANNOT EXIST WHERE CIVIL AUTHORITY IS ACTING—MARTIAL RULE DEFINED.

There can be no martial law or rule in time of peace in any place where the civil authority is acting, but it is a rule of paramount necessity, arising, if at all, when government under the constitution is resisted by force to the point of suspending the operation and execution of the laws by civil authorities.[4]

5. SAME—NO "QUALIFIED MARTIAL LAW."

There is no such thing as "qualified martial law," no middle ground or twilight zone between government by law and martial rule, since martial rule cannot arise unless and until there is a suspension of civil power.[5]

6. SAME—MILITIA BUT AN AID TO CIVIL AUTHORITIES—GOVERNOR MAY NOT SUSPEND CIVIL LAW.

Under the Constitution of this State the power of the militia in time of peace has been fixed beyond cavil as being no more than an aid to civil authorities in executing the law, and the governor may not suspend the civil law or supplant civil authorities by military rule.[6]

---

[1]Militia, 27 Cyc. p. 507; [2]War, 40 Cyc. p. 389; [3]Militia, 27 Cyc. p. 507 (1926 Anno); [4]War, 40 Cyc. pp. 388, 390; [5]Id., 40 Cyc. p. 388; [6]Militia, 27 Cyc. p. 504.

7. SAME — MILITIA OFFICERS LIABLE FOR INJURIES INFLICTED IN VIOLATION OF CIVIL LAW.

> Under the provision of the Constitution that "the military shall in all cases and at all times be in strict subordination to civil power," any transgression thereof by military officers renders them liable to respond in damages for injury done, no matter how high the command to so act can be traced.[7]

8. SAME—POWERS OF MILITIA SENT TO AID SHERIFF NO GREATER THAN SHERIFF'S.

> The militia, sent by the governor to aid the sheriff of a certain county in preventing the illegal transportation of intoxicating liquors into the State and other lawlessness, could not perform any act not within the power of the sheriff to perform.[8]

9. SAME—MAY NOT HOLD UP TRAVEL AT PERIL OF LIFE OR LIMB.

> A sheriff has no power to hold up travel over the public highway and halt travelers for inquisition and search and exact peril of life or limb for refusal to submit, and, therefore, the militia sent to aid him has no such power.[9]

10. SAME—PERSONAL INJURIES—VIOLATION OF LAW QUESTION FOR JURY.

> In an action against officers of the State troops for personal injuries and for damages to plaintiff's automobile caused, on his failure to stop when signaled, by his coming in contact with a log placed across the highway for the purpose of stopping persons suspected of violating the prohibition law, whether plaintiff was engaged in violating the State or Federal prohibition law at the time the cause of action arose, *held*, under the evidence, a question of fact for the jury.[10]

11. SAME—VIOLATION OF MOTOR VEHICLE LAW NO DEFENSE TO ACTION AGAINST OFFICERS FOR INFLICTING WILFUL INJURIES.

> Plaintiff's violation, if any, of the motor vehicle law, contributing toward causing the accident, would not relieve defendants from liability for injuries wantonly planned and wilfully inflicted.[11]

12. SAME—CONTRIBUTORY NEGLIGENCE NO DEFENSE TO ACTION FOR PERSONAL INJURIES WILFULLY INFLICTED.

> The use of the log to ditch automobiles if drivers thereof should refuse or neglect to stop, was an unlawful, wanton,

---

[7]Militia, 27 Cyc. p. 507; [8]Id., 27 Cyc. p. 504; [9]Id., 27 Cyc. p. 504: [10]Id., 27 Cyc. p. 507; [11]Id., 27 Cyc. p. 507.

and wilful disregard of human life, open to no justification and no defense of contributory negligence.[12]

13. HIGHWAYS AND STREETS—OBSTRUCTION OF HIGHWAY A STATUTORY OFFENSE.
    Although no longer a criminal offense, it is still unlawful to obstruct a highway, and an offense for which the statute enacts a penalty (1 Comp. Laws 1915, § 4461).[13]

Error to Monroe; Root (Jesse H.), J.    Submitted April 29, 1924.    (Docket No. 86.)    Decided October 6, 1924.

Case by Edmond Bishop against Roy C. Vandercook and another for personal injuries and damage to plaintiff's automobile.    Judgment for plaintiff.    Defendants bring error.    Affirmed.

*Andrew B. Dougherty*, Attorney General, and *James A. Greene*, Assistant Attorney General, for appellants.

*Willis Baldwin* and *Ira G. Humphrey*, for appellee.

WIEST, J.    The Dixie highway, so-called, extends from Detroit to Toledo, passing through the county of Monroe.    In June, 1918, prohibition of intoxicating liquors was in force in this State but not in Toledo, Ohio.    The sheriff of Monroe county experienced difficulty in enforcing the liquor law and requested aid from the governor.    June 26, 1918, the governor issued "General Orders No. 36," reading:

"1. The sheriff, prosecuting attorney, and chairman of the board of supervisors in Monroe having stated in writing that the authorities of that county are unable to cope with the lawlessness and disorder arising from the importation of liquor into Michigan through Monroe county, Colonel R. C. Vandercook is directed to take a detachment of men and to proceed to Monroe county for duty.

"2. Such steps will be taken as will protect the

[12]Militia, 27 Cyc. p. 507; [13]Highways, 29 C. J. § 394.

highways from lawless and viciously inclined drivers of automobiles; the laws of the State will be enforced and such assistance given the sheriff of the county of Monroe as he requires in putting a stop to conditions which not only menace the people of Michigan, but the truck transportation of the United States army."

A detachment of Michigan State troops was sent to Monroe county, and on February 7, 1919, were acting under command of defendant Childs as captain. Difficulty experienced by the troops in stopping travelers on the Dixie highway was brought to the attention of the governor by defendant Vandercook as colonel in command of the troops, some time before February 7, 1919, and the governor verbally authorized the placing of a log across the roadway, but directed that "every precaution must be taken to give the good citizens a chance to get through and to see that people were not inconvenienced and to take such steps as would give everybody a warning as to the use of the log." Thereupon, by direction of defendant Vandercook, a log about 12 feet long, 8 inches in diameter at the small end and 10 inches at the large end was procured and directions given that the log be pulled across the roadway in case drivers of automobiles refused to stop upon signal. About a mile and a half south of the city of Monroe, and on the Dixie highway, a signal post in charge of two troopers was maintained, and about 200 yards north thereof two other troopers were stationed with the log. The signal post troopers were directed to stop and investigate travelers approaching by automobile from the direction of Toledo, of whom they should entertain suspicion, and in the nighttime, if any one refused to stop upon signal, to fire in the air and thereby warn the troopers at the log, and it was then the duty of the troopers at the log to pull it across the roadway and exhibit red and flashlights to stop the traveler,

and if the signals were not heeded to ditch the automobile.

February 7, 1919, between 2 and 3 o'clock in the morning the troopers at the signal post discovered an automobile with dimmed lights approaching from the direction of Toledo, jumped into the roadway, by flashlights signaled its driver to stop, and upon his not doing so, fired a signal. Two troopers between the signal post and the log signaled by flashlight for the driver to stop, and the troopers ahead pulled the log across the roadway, gave flashlight and red lantern signals without effect and the automobile struck the log and was ditched. Defendants claim the car was going 50 or 60 miles an hour. In the wreckage was found a large quantity of intoxicating liquor. Word had been received by the officers in command of the troops that probable transportation of liquor over the highway at that time would be attempted, but had no specific information pointing out plaintiff.

Plaintiff owned and operated a taxicab in the city of Toledo, and about midnight of February 6, 1919, was called to service at a place he found to be a saloon. At the saloon he was told by his fare to wait a while and did so, and when his fare gave direction to go to another place in the city plaintiff noticed something in the tonneau of the car covered with the robe, but made no investigation. While proceeding to the place designated a view of a policeman caused the fare to give new directions. Two other men were picked up at the request of the fare and plaintiff was given $35 to drive them to Detroit. Plaintiff claimed at the trial that, while driving over the Dixie highway near the city of Monroe, on his way to the city of Detroit, on account of weather conditions, he used dimmers and suddenly he saw two men jump out from alongside of the roadway and begin shooting and he thought they were "stick-up men" and did not stop, saw no

later signals, drove against the log, his automobile was ditched and he awakened later in his sister's home in Toledo.    He also claimed at the trial that he did not accelerate the speed of the automobile before striking the log, but was traveling 15 or 20 miles per hour.    He also claimed ignorance of the fact his fares were transporting liquor.    This suit was brought to recover damages for injuries to the automobile, and the declaration was later amended to include damages for personal injuries sustained by plaintiff.    The jury awarded plaintiff a verdict of $2,000.    Defendants review by writ of error.

It is the claim of plaintiff that the acts of the troopers were unlawful, by direct command of defendants and such acts by defendants constituted a purposeful and wilful trespass.    The jury must have been impressed with plaintiff's story of his connection with the affair in order to have rendered the verdict given.    Questions of fact within the province of the jury will not be here reviewed.

Defendants direct our attention to the provisions of section 41, Act No. 53, Pub. Acts 1917 (Comp. Laws Supp. 1922, § 916), and assert they are privileged from suit.    This section provides:

"Whenever the Michigan national guard or any portion thereof shall be ordered into actual service, * * * the commanding officer shall be subject to the general direction of the sheriff or other civil officer who shall require his aid; but in the execution of movements and the means to be employed to accomplish the purpose for which said military force shall be called into service, the same shall be under the orders of the commander-in-chief and the military officers immediately in command thereof. * * * Whenever in such service, troops shall always be amenable to the civil authorities as represented by the governor, and shall be privileged from prosecution by the civil authorities, except by direct order of the

228—Mich.—20.

governor, for any acts or offenses alleged to have been committed while on such service."

We accept the claim that the proper request for aid was made by the sheriff to the governor and the troops were in actual service under executive order. This brings us to the question of whether any and all acts and offenses committed by the troops to the injury or damage of citizens are beyond redress by action in court. We cannot approve of the contention that the State troops in time of peace, and in actual service in aid of civil authority, are privileged from civil accountability for wrongs committed, except by direct order of the governor. The statute quoted means no such thing; if it did it could not be upheld, for the right of citizens to resort to the courts for the redressing of wrongs cannot be made subject to the arbitrary will of the governor. This statute marks the relation to be sustained between the troops in service and the civil authorities. It stays interference by the civil authorities but does not close the courts to persons wronged by military lawlessness. The purpose of the statute is plain and serves its end without extending it beyond legal limits. This statute must be read with the distinction between military law and martial law in mind. Military law is enacted for the organization, government and discipline of troops and applies only to persons in military service. Martial law, or rule, applies to all persons and property within a district subject to it. When proper civil authority invokes military aid, it is extended as an aid and while soldiers are subject to military law, that fact does not take away from citizens the rights and remedies for injuries arising through wrongful exercise of military law or power. The military law of the State is found in legislative enactments in accordance with constitutional provisions. Citizens are not governed at all by military

law; they may be governed in a proper case by martial law.    Military aid to civil authorities must act within and in accordance with the civil law.

"When the citizen is governed by the military power, he is not governed by the soldier's code of military law, but he is said to be governed by martial law; and this law is perfectly distinct and entirely different from military law, to which soldiers are subject.    When the military commander, as the agent of the king, president, or governor, governs the citizens, he does not rule them by the code of military law, enacted for the soldiers, as has been said, and for disobedience to which they are punished, but he governs the citizens by arbitrary will."    *Griffin* v. *Wilcox*, 21 Ind. 370, 376.

The Constitution makes no mention of martial law or rule, not because it was unknown to the framers, but because it was well known to be no law at all, and only a rule of paramount necessity arising, if at all, when government under the Constitution is resisted by force to the point of suspending the operation and execution of the laws by civil authorities.    This is one reason why the Constitution declares that the civil authority shall be paramount to military power. There can be no martial law or martial rule, in time of peace, in any place where the civil authority is acting.    There can be military law at all times, for such law in no wise affects citizens not soldiers.    The military law of the State makes soldiers amenable to executive authority, and this is proper, but it cannot subject the rights of citizens to military action and render sufferers helpless by way of redress except it be the will of the governor to grant the boon.    To do so would engraft upon legitimate military law a feature of martial rule without martial rule at all in fact.    To render the imperative mandate of the Constitution, placing the military in all cases and at all times in strict subordination to civil power as per-

missive of military action no matter how injurious to citizens, beyond the province of the courts to grant redress, unless the governor so wills, would be violative, not only of its text, but its spirit and create an intolerable arbitrary power.

The act mentioned prevents interference with the movements and operations of the military forces while carrying out orders of the executive in aid of civil authorities, but does not, and cannot, in any sense prevent citizens, suffering wrong, from having recourse to the courts. We have been unable to find a provision of like character to the act in question, except in time of actual war (*Drehman* v. *Stifel,* 41 Mo. 184 [97 Am. Dec. 268]), or applied, in principle, where a foreign army was permitted to march through a friendly country, or to be stationed in it by authority of its sovereign government, or the laws of war prevail. See *The Exchange,* 7 Cranch (U. S.), 116; *Coleman* v. *Tennessee,* 97 U. S. 509; *Dow* v. *Johnson,* 100 U. S. 158.

No man within this jurisdiction may be required to sue to the executive for leave to apply to the courts for redress for a wrong suffered. No legislative enactment can confer power upon the chief executive of the State to render the military immune from civil responsibility for wrongs done to citizens in time of peace, or grant to the military security beyond that accorded the civil officers in whose aid they act. In aiding the execution of the law all authority, civil and military, must observe and obey the law.

It is also claimed in behalf of defendants that it is "not necessary that martial law be declared in order to relieve the militia from prosecution by civil authority for acts committed in carrying out orders of superior officers." We take this to mean immunity from civil liability. In support of this *Commonwealth* v. *Shortall,* 206 Pa. 165 (55 Atl. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759), is cited. In that case

the court applied something designated as "qualified martial law" and held a private was not to be held for manslaughter in obeying the command of his superior officer.   There is no such thing as "qualified martial law."   There is no middle ground, or twilight zone, between government by law and martial rule. Martial law or rule cannot arise unless and until there is a suspension of civil power.   Martial rule is not compatible with the spirit of our institutions for it rules supreme in the territory where employed and is an abandonment of constitutional forms; its use is a confession of weakness rather than an exhibition of vigor of government, because it is a deviation from the course of law and an abandonment of the coercive power delegated by law as an aid to civil authorities.

Martial law, or rather martial rule (for it is no law at all) is a rule of paramount necessity, never existing in company with civil law or authority, for, if the civil law . of the sovereignty is in force and civil authorities acting thereunder, and recognized by the executive, there can exist no such thing as martial law in force in whole or in part in the same field of operation.   When the governor responded to the request of the sheriff of Monroe county he acted under power of the Constitution and sent aid to the civil authorities of that county, and so expressed himself in the very order made.   Such aid, so sent, could not and did not supplant the authority of the civil officers of the county for, under the law, it was subordinate thereto.   The State troops so sent, by order of the governor, constituted an executive force employed under power vested in the chief executive and in compliance with the mandate to see that the laws are executed.

The power of the military in time of peace has been fixed beyond cavil as being no more than an aid to civil authorities in executing the law.   It is so declared by the Constitution of this State, and was so

fixed to ward off the evils of military rule so often recorded in early English history. The governor may not suspend the civil law or supplant civil authorities by military rule. If the civil law is suspended by force and civil authority supplanted then the supremacy of the law may be asserted and maintained by military power. Civil power is supreme while acting and military power is subordinate thereto. There is no such thing as military power, independent of the civil power, while the civil power is functioning. If the civil power, in order to successfully cope with lawlessness, needs the aid of military power the need may be met and the aid extended but it is at all times by way of aid to the civil power and cannot authorize the exercise of independent military power.

The emphatic provision of the Constitution (Art. 2, § 6) of the State that: "The military shall in all cases and at all times be in strict subordination to the civil power," is not an empty phrase but the wisdom of the ages expressed in a succinct mandate. Any transgression of this fundamental law by military officers renders them liable to respond in damages for injury done no matter how high the command to so act can be traced. *Mitchell* v. *Harmony*, 13 How. (U. S.) 115; *Bates* v. *Clark*, 95 U. S. 204. We do not say the acts complained of here were authorized by the governor, for we entertain the opinion that the officials went beyond the intention of the governor, either by reason of misunderstanding of the extent of their authority or in their zeal to get results. No sheriff would undertake to hold up travel over the public highway and halt travelers for inquisition and search and exact peril of life or limb for refusal to submit. No such power is vested in that office. If the power cannot be found in the office of sheriff it certainly cannot exist in any aid called to his assistance.

Martial law was not declared and no occasion existed

justifying any thought of such law, and we only mention the subject of martial law because of defendants' claim of "qualified martial law." If we hold the acts complained of within the law, what law shall we cite as authority? Shall we say the law of necessity? The courts recognize no such law. The so-called law of necessity, or rather lawlessness, was the very curse the provision in our Constitution laid low for all time. Shall we say the end justified the means? If so, where is such law to be found? Shall we find justification in the discovery of the liquor after the ditching of the automobile? If so, where is the law to be found which rests immunity or liability upon a good or bad guess of functionaries?

In *Franks* v. *Smith*, 142 Ky. 232 (134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319), many of the questions here presented are discussed. In that case it appeared the governor of Kentucky had ordered the militia into active service to apprehend "night riders." Soldiers were posted on highways with instructions to halt any two or more men found traveling thereon between the hours of 10 at night and 4 o'clock in the morning, to question them, find out the occasion of their travel and to search them if necessary, and if arms were found to bring the parties into camp to be turned over to the civil authorities. Smith, while traveling with another in a buggy with a firearm therein, was arrested by defendant Franks and brought suit for damages. Franks contended that "a soldier in active service is not amenable to civil authorities for his reasonable acts performed in strict obedience to orders of his superiors." It was assumed that the orders in question were traceable to the chief executive. After ably pointing out the power of the governor to preserve peace, protect lives and property and to take due care to see that the laws of the State are faith-

fully executed and to employ the militia, if necessary, the court stated:

"Having this view of the power and duty of the governor, it must nevertheless be kept in mind that in its exercise he acts in his capacity as a civil officer of the State and not as commander-in-chief of its army. As the chief civil magistrate of the State, he calls out and must direct in accordance with law the movements and operations of the military forces. 'The military shall be at all times and in all cases in strict subordination to the civil power.' It is so written in section 22 of the bill of rights. We have not, and cannot have, in this State a military force that is not and will not be subordinate to the civil authorities. The military cannot in any state of case take the initiative or assume to do anything independent of the civil authorities. Ours is a government of civil, not military forces. The militia in active service and in every emergency that arises in such service is subordinate to the civil power. The soldier and the citizen stand alike under the law. Both must obey its commands and be obedient to its mandates.

"It follows from these considerations that we are not disposed to agree with the doctrine announced by the supreme court of Colorado in Re Moyer, 35 Colo. 159 (85 Pac. 190, 12 L. R. A. [N. S.] 979), that in certain emergencies the civil law may be suspended by military orders. Or with the supreme court of Pennsylvania in the case of Commonwealth v. Shortall, 206 Pa. 165 (55 Atl. 952, 65 L. R. A. 193, 98 Am. St. Rep. 759), where the court, in discussing the relative supremacy of the military and civil authorities in a state of case in which the civil authorities being unable to preserve peace and quiet the military of the State was called out to restore order, said:

" 'Martial law exists whenever the military arm of the government is called into service to suppress disorder and restore the public peace. * * * The resort to the military arm of the government therefore means that the ordinary civil officers to preserve order are subordinated and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander. To call out the military and have them stand quiet and helpless,

while mob law overrides the civil authorities would be to make the government contemptible and destroy the purpose of its existence.    The effect of martial law, therefore, is to put into operation the powers and methods vested in the commanding officer by military law.    So far as his powers for the preservation of order and security of life and property are concerned, there is no limit but the necessities and exigencies of the situation.    And in this respect there is no difference between a public war and domestic insurrection.'

"We are not willing to concede that in any exigency that may arise the military is superior to the civil authorities.    We do not apprehend that any conditions could come up that would justify us in so holding. Nor do we believe that the time will ever come when the military forces of the State, acting under and in obedience to the civil laws of the State will not be able to control under the authority conferred by these laws any situation that may present itself."

The court then considered the question of what protection, if any, from civil or criminal liability the soldier has when acting in obedience to the orders of his superior officer, and what orders of his superior the soldier may obey and be exempt from civil liability and what orders his obedience to will subject him to suit.    The opinion upon these questions is too long to be quoted, but upon the last subject the court said:

"Upon this point, after mature consideration, we have reached the conclusion that any military order, whether it be given by the governor of the State or an officer of the militia or a civil officer of a city or county, that attempts to invest either officer or private with authority in excess of that which may be exercised by peace officers of the State is unreasonable and unlawful; and if it is obeyed, the officer or private giving obedience subjects himself to such punishment and liability as the penal and civil laws of the State might inflict against a private individual guilty of similar transgression of the law or the rights of the citizen. * * * The only difference between our ruling and that obtaining in the authorities cited is that we define more precisely than they do what orders a soldier is

justifiable in executing, and hold as a matter of law that these orders are confined to such as a peace officer in the discharge of his duty might execute. In respect to these orders, the powers of the military and local civil officers of the State are identical. What one cannot do, neither can the other; what one may do, so may the other. The soldier has the same measure of protection and is subject to the same liability, whether he is acting under the orders of a military officer, independent of the local civil authorities, or is acting under immediate direction of these authorities. Neither has the right to give any orders or directions except those that a peace officer of the State might rightfully execute; and if the soldier does only what a peace officer may do, then he is entitled to the immunity afforded peace officers in the performance of their duty."

The arrest of Smith by Franks and his associates was held indefensible and a verdict awarding Smith $1,000 damages affirmed.

The purpose in using the log was to stop plaintiff at all hazards. It involved and was intended to exact peril to life or limb if not seen or heeded upon signal to stop. Defendants are in no position to urge that, had plaintiff circumvented their efforts to stop him by running around the end of the log, as he might have done, he would not have been hurt. What, in fact, happened was exactly what defendants planned and willed to happen in case of disobedience of signals to stop. Therefore, their liability rests upon the calculated result of their wilful and wanton act. Whether plaintiff was engaged in violating the prohibition law of the State (then a misdemeanor) and the Federal law against the transportation of liquor (a felony) were questions of fact for the jury, and the court properly refused to instruct the jury that plaintiff was guilty of such violations. Violation, if any, of the motor vehicle law contributing toward causing the accident would not relieve defendants from liability for injuries wantonly planned and wilfully

inflicted. The charge of the court did not leave the subject of comparative negligence to the jury. The use of the log to ditch automobiles, if drivers thereof should refuse or neglect to stop, was an unlawful and wanton and wilful disregard of human life, open to no justification and no defense of contributory negligence.

It was a public nuisance and an indictable offense at common law to lay logs in a highway and no excuse that they were laid only here and there, so that people might have a passage through them by windings and turnings. 2 Hawk. Cr. Pl. 404. It is still unlawful to so obstruct a highway but no longer a criminal offense but an offense for which the statute enacts a penalty. 1 Comp. Laws, 1915, § 4461; *Pettinger* v. *People,* 20 Mich. 336. It was intended and well calculated to inflict injury upon any one not observing or not obeying its challenge to disaster and placed across the roadway after it was apparent a driver might not stop on signal and left there to ditch him for not stopping.

We feel we have covered the questions presented and, as we find no reversible error, the judgment is affirmed, with costs to plaintiff.

CLARK, C. J., and BIRD and FELLOWS, JJ., concurred with WIEST, J.

McDONALD, SHARPE, MOORE, and STEERE, JJ., concurred in the result.