28 P.(2d) 4

**STATE ex rel. ROBERTS v. SWOPE.**

No. 3946.

Supreme Court of New Mexico.

Nov. 10, 1933.

Rehearing Denied Jan. 8, 1934.

Edward D. Tittmann, of Hillsboro, for relator.

E. K. Neumann, Atty. Gen., and Harry S. Bowman, of Santa Fé, for respondent.

HUDSPETH, Justice.

Robert F. Roberts, in the custody of E. B. Swope, superintendent of the New Mexico Penitentiary, under restraint order of the Commander of the New Mexico National Guard in McKinley county, in which the late Governor Seligman had declared a state of insurrection to exist and proclaimed martial law, seeks discharge under a writ of habeas corpus issued by this court. The return to the writ of habeas corpus, to which is attached the proclamation of the Governor by which he declared the county of McKinley to be in a state of insurrection, declared martial law, and ordered Brigadier General Osborne C. Wood, Adjutant General of New Mexico, to assume supreme command of the situation in said county, states:

That said Adjutant General, with officers and troops of the New Mexico National Guard under his command, proceeded to McKinley county and ever since has been and now is actively engaged in quelling the disturbances which called forth the proclamation and order aforesaid.

That said commanding officer and other officers became convinced that the arrest of the relator was necessary and advisable by reason of his activity in fomenting and keeping alive the conditions of insurrection and lawlessness existing in McKinley county, and in urging resistance to the National Guard of New Mexico.

That the said relator was arrested on the order of the said Adjutant General after he and others became convinced that said relator was a member of a group, and that if not arrested, or if discharged from arrest, he would and will continue to foment and keep alive the conditions of insurrection and lawlessness existing in McKinley county by urging resistance to the National Guard.

That it is the intention of the said Adjutant General to release and discharge the said relator from military arrest as soon as can be safely done with relation to the suppression of the existing state of insurrection in McKinley county.

The relator, in his answer to the return, denies that, if discharged from arrest, he would continue to foment and keep alive the conditions of insurrection and lawlessness, and further states: "Relator denies that martial law was at any time effective in McKinley County, and alleges that it is not in effect there now and says that it cannot be in effect under the Constitution of the United States and the laws and Constitution of the State of New Mexico."

In argument on the writ, the relator admits that the Governor's declaration that a state of insurrection exists cannot be controverted, but maintains that the militia can only be used as deputy sheriffs or as assistants of civil peace officers. He cites Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281; dissenting opinion of Robinson, J., in State v. Brown, 71 W. Va. 519, 77 S. E. 243, 45 L. R. A. (N. S.) 996, Ann. Cas. 1914C, 1; Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319; Constantin v. Smith (D. C.) 57 F.(2d) 227, and the same case, Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190, 77 L. Ed. 375; United States v. McDonald (D. C.) 265 F. 754, 755; Bishop v. Vandercook et al., 228 Mich. 299, 200 N. W. 278;

Christian County v. Merrigan, 191 Ill. 484, 61 N. E. 479; Military Law and War Time Legislation, p. 820 (Opinion U. S. Judge Advocate General, March 21, 1918); U. S. Code Annotated, title 10, p. 271; Military Government and Martial Law, Birkheimer, pp. 32, 371, 375, 384.

The respondent challenges the jurisdiction of this court to proceed further in the matter, and maintains that the Governor and his officers can legally carry the usages of war to their logical conclusion, can seize and hold persons whom they believe are contributing to a continuance of the insurrection, and that the civil courts cannot properly interfere. He cites section 4, art. 5, Constitution of New Mexico; 1929 Comp. §§ 93-104 and 93-105; The Rationale of Martial Law, American Bar Association Journal, p. 550, issue of September, 1929; State v. Brown, 71 W. Va. 519, 77 S. E. 243, 45 L. R. A. (N. S.) 996, Ann. Cas. 1914C, 1; Moyer v. Peabody, 212 U. S. 78, 29 S. Ct. 235, 53 L. Ed. 410; In re Moyer, 35 Colo. 159, 85 P. 190, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189; Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319; In re Boyle, 6 Idaho, 609, 57 P. 706, 45 L. R. A. 832, 96 Am. St. Rep. 286; Luther v. Borden, 7 How. 1, 12 L. Ed. 581; Commonwealth v. Shortall, 206 Pa. 165, 55 A. 952, 65 L. R. A. 193; 98 Am. St. Rep. 759; In re Jones, 71 W. Va. 567, 77 S. E. 1029, 45 L. R. A. (N. S.) 1030, Ann. Cas. 1914C, 31; Raymond v. Thomas, 91 U. S. 712, 23 L. Ed. 434.

We have been favored by able argument of counsel and have given much thought and consideration to the important question at issue in this case.

Article 5, § 4, of the New Mexico Constitution, is as follows: "The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed. He shall be commander in chief of the military forces of the state, except when they are called into the service of the United States. He shall have power to call out the militia to preserve the public peace, execute the laws, suppress insurrection and repel invasion."

The importance of this duty of the chief magistrate of the state was lately the subject of comment by Chief Justice Hughes in Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190, 196, 77 L. Ed. 375. He said:

"By virtue of his duty to 'cause the laws to be faithfully executed,' the executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive. That construction, this Court has said, in speaking of the power constitutionally conferred by the Congress upon the President to call the militia into actual service, 'necessarily results from the nature of the power itself, and from the manifest object contemplated.' The power 'is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union.' Martin v. Mott, 12 Wheat. 19, 29, 30, 6 L. Ed. 537. Similar effect, for corresponding reasons, is ascribed to the exercise by the Governor of a state of his discretion in calling out its military forces to suppress insurrection and disorder. Luther v. Borden, 7 How. 1, 45, 12 L. Ed. 581; Moyer v. Peabody, 212 U. S. 78, 83, 29 S. Ct.

235, 236, 53 L. Ed. 410. The nature of the power also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for, without such liberty to make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the executive in the exercise of his authority to maintain peace. Thus, in Moyer v. Peabody, supra, the Court sustained the authority of the Governor to hold in custody temporarily one whom he believed to be engaged in fomenting disorder, and right of recovery against the Governor for the imprisonment was denied. The Court said that, as the Governor 'may kill persons who resist,' he 'may use the milder measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power. So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the Governor is the final judge and cannot be subjected to an action after he is out of office on the ground that he had not reasonable ground for his belief.' In that case it appeared that the action of the Governor had direct relation to the subduing of the insurrection by the temporary detention of one believed to be a participant, and the general language of the opinion must be taken in connection with the point actually decided. Cohens v. Virginia, 6

Wheat. 264, 399, 5 L. Ed. 257; Carroll v. Carroll's Lessee, 16 How. 275, 287, 14 L. Ed. 936; Myers v. United States, 272 U. S. 52, 142, 47 S. Ct. 21, 71 L. Ed. 160.

"It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary is well established. What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions. Thus, in the theater of actual war, there are occasions in which private property may be taken or destroyed to prevent it from falling into the hands of the enemy or may be impressed into the public service, and the officer may show the necessity in defending an action for trespass. 'But we are clearly of opinion,' said the Court speaking through Chief Justice Taney, 'that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. * * * Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified.' Mitchell v. Harmony, 13 How. 115, 134, 14 L. Ed. 75. See, also, United States v. Russell, 13 Wall. 623, 628, 20 L. Ed. 474. There is no ground for the conclusion that military or-

ders in the case' of insurrection have any higher sanction or confer any greater immunity."

It appears by the foregoing that our highest court took occasion to emphasize, by repetition, its holding in Moyer v. Peabody, to the effect that the Governor might seize the bodies of those whom he considered to stand in the way of restoring peace and restrain them of their liberty until the disorders were quelled. Mr. Justice Holmes, in the opinion of the court in Moyer v. Peabody, speaks of the power of the Governor in cases of this sort as executive process, and, so long as it is not abused, the courts will be reluctant to interfere with the executive authority in their efforts to subdue the insurrection. The decision in Moyer v. Peabody was rendered in 1909. Our Constitution was written the following year and contains the same provisions as to the military being in subordination to the civil power and as to the privileges of the writ of habeas corpus as the Constitution of the neighboring state of Colorado.

Relator's theory that the military can only be used as deputy sheriffs or constables in cases of insurrection is not tenable. The employment of the military is not resorted to while the local peace officers are able to cope with the situation. The troops were sent into the district when the local officials were no longer able to maintain law and order, and after the Governor had found a state of insurrection to exist. They proceeded under the "executive process," authorized by the constitutional provision, above quoted, as military forces and were authorized to act as such in suppressing the insurrection.

"The resort to the military arm of the government, therefore, means that the ordinary civil officers to preserve order are subordinated, and the rule of force under military methods is substituted to whatever extent may be necessary in the discretion of the military commander. To call out the military, and then have them stand quiet and helpless, while mob law overrides the civil authorities, would be to make the government contemptible, and destroy the purpose of its existence.

"The effect of martial law, therefore, is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned, there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful." Commonwealth v. Shortall, 206 Pa. 165, 55 A. 952, 955, 65 L. R. A. 193, 98 Am. St. Rep. 759.

The courts will not interfere with the co-ordinate branch of the government in quelling the disturbances and overcoming of the lawless element in its resistance to authority. For instance, the courts will not restore to the insurrectionists their arms taken from them by the military until after peace has been established. The Governor and his officers have a wide discretion in the steps which they may take in suppressing insurrection. Whether or not the executive or military force has overstepped the line is a judicial question, but we hold, under the authori-

ty of Moyer v. Peabody, supra, and Sterling v. Constantin, supra, that the restraining of his liberty, during the pendency of the insurrection, of one who is arrested while fomenting or participating in the insurrection, is within the executive discretion. Accordingly, the writ should be discharged and the relator remanded to the custody of respondent. It is so ordered.

WATSON, C. J., and SADLER, BICKLEY, and ZINN, JJ., concur.

On Motion for Rehearing.

PER CURIAM.

On the coming in of petitioner's motion for rehearing, it is made to appear by suggestion on the part of respondent that the petitioner has been discharged from custody. The cause being thus moot, the motion for rehearing will stand denied without consideration of its merits.